[Crim. No. 8757. Third Dist. May 8, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH CAMACHO BURCIAGO et al., Defendants and Appellants.

### Counsel

Paul Halvonik, State Public Defender, under appointment by the Court of Appeal, Gary S. Goodpaster, Chief Assistant State Public Defender, and Marilyn Fisher, Deputy State Public Defender, John W. Hedden, Jr., and Bryan Kemnitzer, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Michael V. Franchetti and G. Michael Gates, Deputy Attorneys General, for Plaintiff and Respondent.

### Opinion

**REYNOSO, J.**—Defendants were jointly charged with four counts of robbery (counts I, III, IV and V), each count further alleging the use of a

handgun. In addition, defendants were individually charged, Thomas with four counts of receiving stolen property (counts II, VI, VII and IX) and Joseph with one count of robbery (count VIII.) A jury trial was held. Defendant Joseph was found guilty of two of the jointly charged robberies (counts I and III), to have used a firearm in the commission of those offenses, and not guilty of the two others so charged. As to the robbery with which he alone was charged (count VIII), the jury was unable to reach a verdict and a mistrial was declared. Thomas was found guilty, in respect to the robbery charges, only as to that charged in count IV of the information, a count upon which his codefendant had been acquitted. Thomas' use of a weapon during the commission of that offense charged was also found. The jury also found Thomas guilty of two counts of receiving stolen property (counts II and VI). Both defendants were sentenced to state prison for their offenses. Both appeal.

Defendant Thomas Burciago raises two contentions. First, the improper admission of hearsay testimony regarding statements incriminating him made to the police by the witness George Purdy violated his right of confrontation, as guaranteed by the federal Constitution; second, his right of confrontation was denied through the prosecutor's improper use of leading questions.

Defendant Joseph Burciago contends on appeal that: (1) the verdicts regarding the Simmons' robbery (charged in count I) and the Ott robbery (charged in count III) are not supported by substantial evidence; (2) the court abused its discretion in denying Joseph's motion that the jury be allowed a view of the peephole device in the door of the witness Edna Hayes, who testified in respect to the Simmons' robbery; and (3) the court erred in denying Joseph's motion that the identification testimony of victim Leo Simmons be stricken.

Review of the record compels the conclusion that neither the contentions asserted by Thomas Burciago nor those advanced by Joseph Burciago are meritorious. The judgments against each may properly be affirmed.

## FACTS

### Robbery in the Simmons' Home

Count I, a count upon which only Joseph was found guilty, involved a robbery in the Tracy home of Leo and Laura Simmons. The facts surrounding this offense are as follows:

Edna Hayes, whose home was two doors away from that of Leo and Laura Simmons, testified that shortly before 11 p.m. on September 23, 1975, there was a knock at her door. She asked who was there. A male voice replied, telling her that he wanted some water. She looked through the peephole in her door and observed a man whom she identified at trial as Joseph. Her testimony included a description of the man, his physical characteristics, and his clothing. She told him that there was a hose out front but he asked for a bucket, stating that something was wrong with his car. She told him to go away, which he did.

A few minutes later, at approximately 11 p.m. the Simmons' doorbell rang. Mrs. Simmons looked out a front window and observed a man clothed in the manner as that previously described by Mrs. Hayes. She remarked to her husband how unusual it was for a man to be outside wearing a coat on such a warm evening. Her husband opened the door and was told by the man that he needed water for his car, to which Mr. Simmons replied there was a hose and faucet out front. The man said he needed a bucket and Mrs. Simmons brought one. As Mr. Simmons unlocked his outside door, the man placed a gun to Simmons' head and forced entry into the home, saying it was a robbery. Mr. Simmons' description of the man's clothing matched that given by his wife and by Mrs. Hayes. A second and larger man entered the house with the first one and they tied up Mr. and Mrs. Simmons and took several items from the home, including a television set, linens, blankets, two belts, and a Masonic ring. Mr. and Mrs. Simmons were tied with strips of torn bedsheets, gagged, and a sheet was thrown over their heads.

Mr. and Mrs. Simmons were unable at trial positively to identify either defendant but Mr. Simmons did testify that Joseph resembled the man who had first had contact with them. Mr. Simmons had also picked Joseph out of a lineup as resembling that first man. Both Mr. and Mrs. Simmons testified that the second man had a stocking over his face, and that he held a knife to Mr. Simmons' throat. Mr. Simmons testified that at one time, while lying bound and gagged he saw three sets of feet rather than just two, and heard one man speak in Spanish to someone outside. After the men left, Mrs. Simmons was able to untie herself and called the police.

The value of the items taken was approximately $3,000.

*Robbery of the Ott Home*

Count III, of which Joseph alone was convicted, involved a robbery of the Stockton home of Mrs. Patricia Ott. The facts relating to this offense are as follows:

Mrs. Ott was in her living room at approximately 8:25 p.m. on September 30, 1975, when her dog started to bark. Mrs. Ott went out to her service porch and saw a man she later identified as Joseph crouched behind a door pointing a gun at her. He threatened to kill her if she made a noise, then marched her into a bedroom in the home, where, at his command, she lay on the bed with a blanket over her face. He asked her for her valuables and was directed to her money. He ordered her into a closet and jammed a chair up against the door. He came back, told her he couldn't find the money, and took her out of the closet so she could show him where it was. After taking the money he walked her back towards the closet asking her if she had any guns or jewelry, and took her watch when she replied she had nothing else. He again placed her in the closet. She heard footsteps going out and then the closet door opened and two men looked in at her and again closed the door. She heard the second person, whom she identified at trial as Thomas, tell Joseph, " 'Kill her, chicken, go ahead.' " She heard the two walking around and finally they came back, took her out of the closet and told her again to get on the bed, which she did. Joseph asked her if she had anything else of value and she told him of a little more money. She was then tied and gagged by the man she identified as Thomas, who picked up the edge of the mattress and flipped her over so that she was lying between the wall and the bed, and covered her face with the bedspread. This man then leaned over her, told her he had a silencer on his gun and that he could kill her and no one would know the difference. Mrs. Ott, however, did not see any gun in his hand or on his person. She heard some more movement around the house and then Joseph took the blanket off her face telling her he was giving her some air. She heard further movement in the house and then departure. She managed to free herself and call the police. In addition to her watch and money, a wallet and some cuff links were also taken, a total value of approximately $300. Prior to trial Mrs. Ott had identified Joseph from photographs shown her by the police and had selected a photograph of a Felix Burciago as resembling the second robber.

*Robbery of the Deloney Home*

Count IV, upon which only Thomas was convicted, involved a robbery in the Manteca home of Barbara and Vernon Deloney.

The Deloneys were watching television in their home at approximately 8 p.m. on October 1, 1975, when Mrs. Deloney heard a noise. She turned towards the sound and saw two men coming from her kitchen, both pointing guns at her. Both men were masked with nylon stockings, in each of which the eyes and the mouth had been cut out, thus eliminating the natural tautness of the nylon. She identified the first of the men at trial as Thomas but was never able positively to identify the second man as Joseph. The Deloneys were ordered to quiet their dog, lock their front door, which had been open since Mrs. Deloney was planning to leave to go pick up her daughters, and to turn the lights off in the living room. The men asked the Deloneys for their money, took it and Mrs. Deloney's wallet containing her credit cards and ordered her to lie down on the floor. Thomas, identified by Mr. Deloney at trial, cocked his gun and placed it threateningly in Mr. Deloney's mouth. Thomas got a sheet which he tore into strips and used to tie up Mrs. Deloney. He then picked her up and carried her into the bathroom where he deposited her in the tub. The other man remained in the living room with Mr. Deloney, threatened him with a knife, jabbing him and drawing blood with it. Thomas returned and asked Deloney if he had any guns, threatening to kill him for lying. Thomas struck Deloney in the head with his gun and then tied him and put him in the bathroom with his wife. After the Deloneys heard the men leave, they freed themselves and called the police.

The Deloneys were shown photographs but were unable to identify either defendant. Mrs. Deloney ultimately selected Thomas' picture from photos of a police lineup, but her husband, until trial, was not able to identify either man.

*Property Taken From Residences of Simmons and Mello.*

Counts II and VII, which were charged against Thomas Burciago alone and of which he was convicted, involved property taken from the Simmons and from the Stockton residence of Marian Mello.

Mrs. Mello's home had been broken into between October 10 and 12, 1975, and many items of personal property taken, including several distinctive items given her as gifts.

A search of Thomas Burciago's home made on November 7, 1975, revealed several of those items, as well as several items identified by Mr. and Mrs. Simmons as having been taken from their home at the time of

the attack upon them. Upon his arrest, and after advisement of his rights, Thomas responded to a statement about the stolen items by saying that he had never seen them before and did not know how they happened to be in his home.

*Defenses Presented*

The two defendants in this case are not related by blood. Joseph's brother was married to Thomas' mother, but the defendants had had no contact with each other for at least several years prior to the time of these offenses. Both defendants testified at trial. Joseph denied committing any of the robberies and though unable to recall where he had been on September 23 and September 30, the dates of the robberies for which he was convicted, he did account for his time on October 3, and on October 25, the dates on which the crimes involved in counts V and VIII were committed. Thomas' defense for the Deloney robbery was alibi in that he stated he was at a family gathering at the home of his sister Bernice on the date that crime occurred. Thomas' alibi for that date, October 1, was corroborated by friends and relatives present at a family gathering held on the crime date. As to the stolen property found in Thomas' home, both he and his wife, Rosie, testified that she had bought those items from someone she had met at her mother's house, and that upon seeing the items Thomas became angry and told her to get rid of them. Rosie also insisted that she had received a receipt for her purchase and had given it to a public defender who had represented Thomas at the initial stages of the case. The public defender in question testified to having received a piece of paper from Rosie, which he characterized as a receipt for the items found, although not itemized. The paper, however, had been misplaced and not yet found at time of trial.

I

APPEAL OF THOMAS BURCIAGO

Thomas' contentions on appeal both relate to examination of the witness George Purdy and to testimony given by Stockton Police Officer James Miller, of statements previously made to him by Purdy linking Thomas to the Deloney and other robberies. Since these contentions are interrelated we discuss them together.

Purdy, called as witness by the People, identified himself as presently residing in Deuel Vocational Institute and refused to answer any further

questions by the prosecutor. It was revealed in an in-chamber discussion that while Purdy was in custody in the Sacramento County jail, he had been interviewed by Officer Miller regarding his possession of a credit card taken in the Deloney robbery. After advisement and waiver of his *Miranda* rights, he assertedly made statements relating to Thomas' involvement with the crimes charged. The court determined that there was no issue of immunity present, recalled the jury, and allowed the questioning of Purdy to proceed.

The first question asked of Purdy was whether he was in the Sacramento County jail on November 12, 1975. The following exchange then occurred:

"A. I am not answering questions.

"Q. What was the answer?

"A. I am not going to answer your questions.

"THE COURT: You are ordered to answer the question, Mr. Purdy. Do you still refuse?

"THE WITNESS: I still refuse.

"MR. SHATTUCK: Q. What is the ground for the refusal?

"A. That harm might come to me in any institution in California if I testify against any other person, and I am in an institution and my life is more precious than anybody's in here.

"Q. Do you remember talking to Detective Miller of the Manteca Police Department October 12, 1975 at the Sacramento County Jail?

"A. I don't remember anything.

"THE COURT: You don't remember talking?

"THE WITNESS: I am not answering.

"THE COURT: You don't remember talking to Officer Miller?

"THE WITNESS: I am not answering any questions." The prosecutor next asked Purdy whether he remembered being given his *Miranda* rights and whether he recalled Officer Miller asking him about the Deloney credit card. Purdy again replied that he was not going to answer any questions and again was ordered to do so. When asked if he had pled guilty to a receiving charge in regard to that card, he replied, "I don't know. I am not answering." The court questioned this reply and again

ordered Purdy to answer the questions, and Purdy reiterated his explanation for his refusal. Questioning was resumed, as follows:

"MR. SHATTUCK: Q. It is true you were charged with three counts of three felonies, one burglary, one receiving stolen property and Count Three was receiving stolen property and had to do with that particular credit card, is that right?

"A. I don't remember the charges.

"THE COURT: Are you refusing to answer the questions?

"THE WITNESS: I don't remember what they were exactly, just what I stated, Your Honor. One of the charges was burglary. That was it. I don't know anything else.

"THE COURT: Did it involve this credit card?

"THE WITNESS: I don't remember, Your Honor.

"MR. SHATTUCK: Q. It is true, isn't it, the burglary charge was dismissed when you pled guilty to the receiving stolen property offense regarding that particular credit card, People's 23 made out to Vernon Deloney? Isn't that right?

"A. I don't know. I don't recall what I copped to in that court. I don't have the legal status.

"Q. But you pled to something, right?

"A. Something.

"Q. That is how you got in prison, right, because you pled guilty to something?

"A. To something.

"Q. The other charges were dismissed, right?

"A. I guess so.

"Q. And it's true that when you were arrested up in Sacramento that particular credit card, People's 23 was in your possession. Isn't that right?

"A. I am not answering that.

"Q. It is true it was in your possession?

"A. I don't know.

"MR. VAN DYKE: Your Honor, that question has been asked and answered. He said he is not going to answer it.

"THE COURT: I am ordering you to answer the question.

"THE WITNESS: I am not answering.

"MR. SHATTUCK: Q. You told Detective Miller up at the jail there, Sacramento County Jail September—November, 1975 that you knew the person who had given you that particular credit card but you were afraid to say the subject's name?"

At this point, Thomas' counsel objected to any further questioning of the witness on the ground that the prosecutor was using his questions as a means of placing incriminating evidence before the jury. The objection was overruled, and the prosecutor allowed to reframe the last question. Purdy's reply this time was not a refusal to answer, nor a claim of lack of memory; rather, it was a flat denial that he had made any such statement to Officer Miller.

Attempts by the prosecutor to press the matter and thus reveal the statement connecting Purdy to Thomas, and Thomas to the crimes resulted in a retreat by Purdy to his refusal to answer, notwithstanding the court's orders.

Finally, the prosecutor asked Purdy whether he had told Officer Miller that Thomas had asked Purdy to assist him in committing a robbery. Purdy replied, "No way." When ordered to answer that question, Purdy said that he had, clarifying the meaning of his answer as follows:

"THE WITNESS: No way. I did not say. I won't answer that, Your Honor. No way did anybody ever ask me to commit a crime with him." Only two further questions were asked by the prosecutor, and to those Purdy again refused to respond.

Thomas' counsel took Purdy on cross-examination, but was unsuccessful at getting Purdy to say anything relevant to Thomas, although he did manage to get an explanation of Purdy's prior reference to threats towards him which may have affected statements made by him to Officer Miller.

Specifically, Purdy testified that he and his wife were taken into custody, their child taken to the receiving home, and threats made that he and his wife would be charged with the charges in this case unless he cooperated. He did say that he told someone, apparently Officer Miller "that it was some Chicano dude in the field," and that he "picked a

picture, any picture." He also stated that he did plead guilty to one charge, but wasn't sure whether it was burglary, receiving stolen property or forgery.

Officer Miller was called as a prosecution witness and testified that Purdy, after advisement and waiver of his *Miranda* rights told him that he had been given the Deloney credit card by a man with whom he was working at Booth Farms in San Joaquin County; that he had been offered other Deloney cards, which he was told had recently been taken in a burglary and which should be useable for a short time. The other cards had expired and Purdy chose to use only the one with which he was found. While Purdy knew the man only as "Tom" he could and did identify him from photographs as Thomas Burciago. Purdy also volunteered, after identifying Thomas and learning of the offenses with which the latter was believed to be connected, that Thomas, who told him he had a .32 caliber revolver, had solicited him to commit a robbery.

Ruth Booth testified that both Thomas and Purdy worked in the Booth orchard from October 4 to October 9, 1975, and that they appeared to have known each other and to have worked together before.

■ It is conceded by the Attorney General that evidentiary leading questions were utilized by the prosecutor in his attempt to elicit testimony from Purdy regarding the statements made by him to Officer Miller. However, the People vigorously dispute Thomas' contention that reversible error resulted from that conduct, and correctly urge that the subsequent admission into evidence through the testimony of Officer Miller of all the material facts revealed by those questions distinguishes this case from those cited below and relied on by Thomas for the rule barring a prosecutor getting before the jury, "under the guise of cross-examination ... what is tantamount to devastating direct testimony," and holding that to do so creates error of federal constitutional dimension. (*People* v. *Shipe* (1975) 49 Cal.App.3d 343, 349 [122 Cal.Rptr. 701]; *Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074].)

In *Douglas* v. *Alabama, supra,* the alleged accomplice of the petitioner was called as a witness by the prosecution. Asserting the privilege against self-incrimination the witness, who had already been tried and convicted, refused to testify and persisted in his refusal despite order of the court to answer the questions asked. The court declared him a hostile witness and permitted the prosecution to examine him regarding a confession

previously made which thoroughly demonstrated petitioner Douglas' guilt. (380 U.S. at pp. 416-417 [13 L.Ed.2d at p. 936].) No hearsay exception was available in *Douglas* to support admission of the witness' confession.

The court held that a clear denial of the right to confrontation resulted from this conduct, and that the error compelled reversal. (380 U.S. at pp. 419-420, 423 [13 L.Ed.2d at pp. 937-938, 940].)

In *People* v. *Shipe, supra,* Shipe and two others were arrested for the murder of a narcotics dealer. The victim had been repeatedly stabbed by a left-handed person who himself was cut on the hand during the crime. When arrested, Shipe had a knife wound on his left hand. The two men arrested with Shipe entered pleas of guilty to charges of being accessories after the fact to the murder, and were each called as witnesses at Shipe's trial. Each answered preliminary questions only, refusing to answer further. The court held their assertion of privilege invalid and ordered them to respond. When neither complied, the court declared them hostile and permitted the prosecutor to continue his examination. Through the use of leading questions the prosecutor placed before the jury information which overwhelmingly established Shipe as the murderer, provided a narcotics-related motive for the crime, and provided a basis for the inference that two witnesses had revealed this information in their statements to the authorities. (49 Cal.App.3d at pp. 345-350.)

The court in *Shipe,* held this procedure a denial of defendant's right to confrontation, in the same manner as that condemned in *Douglas* v. *Alabama, supra.* The People, in an attempt to avoid application of the *Douglas* rule, referred the court to *Dutton* v. *Evans* (1970) 400 U.S. 74, 79-87 [27 L.Ed.2d 213, 220-226, 91 S.Ct. 210], where it was held that no deprivation of constitutional rights accrued from the admission into evidence, under a state hearsay exception, of statements of a non-testifying convicted accomplice which connected the defendant with the murder charged. There, 20 other witnesses, including an eyewitness, had also testified as to defendant's involvement. (See also, *Chambers* v. *Mississippi* (1973) 410 U.S. 284, 298, 300-301 [35 L.Ed.2d 297, 310-312, 93 S.Ct. 1038].) The *Shipe* court held the *Dutton* v. *Evans* reference unavailing since in *Shipe,* the evidence involved in the evidentiary questions was not permissibly before the jury through any other source. (49 Cal.App.3d at p. 352.)

The case before us is far closer to that of *Dutton* v. *Evans, supra,* than either to *Douglas* v. *Alabama, supra,* or *People* v. *Shipe, supra.* Purdy's statements implicating Thomas were neither the only evidence against him on the particular issues contained therein, nor were they the vital link connecting him with the crimes. Further, the information here involved was admissible pursuant to the exception to the hearsay rule set forth in Evidence Code section 1235 permitting the use of prior inconsistent statements, under the rules defined in *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], and *People* v. *Green* (1971) 3 Cal.3d 981 [92 Cal.Rptr. 494, 479 P.2d 998].

■    Purdy's testimony may be viewed as equivalent to a denial that he made the subject statements to Officer Miller. Any other interpretation of Purdy's responses to the questions asked him would be illogical. Purdy's statements meet the test expressed in *People* v. *Green, supra,* 3 Cal.3d at page 988, of an implied denial. As stated in *Green*: "In normal circumstances, the testimony of a witness that he does not remember an event is not 'inconsistent' with a prior statement by him describing that event. [Citation.] But justice will not be promoted by a ritualistic invocation of this rule of evidence. Inconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement [citation], and the same principle governs the case of the forgetful [or as here, reluctant] witness." Purdy's testimony was a combination of statements of a lack of memory, together with several express denials, and many instances of refusal to answer a question. Viewed in its entirety, it is clear that if not an express denial, it constituted an implicit denial.

■    Where a denial of a previous statement is presented at trial the test of admissibility under section 1235 of the Evidence Code is controlled by the three-fold purpose of confrontation as discussed by the United States Supreme Court in *California* v. *Green, supra,* and phrased in *People* v. *Green, supra,* 3 Cal.3d at page 989, as follows: "(1) [T]o insure reliability by means of the oath, (2) to expose the witness to the probe of cross-examination, and (3) to permit the trier of fact to weigh his demeanor." The first function is served where there is an admission by the witness that he did in fact make the statement or by some other evidence which establishes that it was his statement. The cross-examination testimony of Purdy and the negative testimony given by him on direct amount to an admission of responsibility for some statement to Officer Miller and enough may be gleaned from Purdy's negative answers

to verify that the statement testified to by Officer Miller was in fact that statement.

In regard to the matter of cross-examination, it is true that counsel for Thomas was unable to examine Purdy in regard to the statement in issue, but was able to examine him relating to the asserted threats which resulted in production of the statement, and thus obtained some degree of confrontation. The fact that cross-examination of a witness might prove fruitless does not allow the conclusion to be drawn that such witness is unavailable for cross-examination. (See *People* v. *Green, supra,* at p. 990; see also *United States* v. *Insana* (2d Cir. 1970) 423 F.2d 1165, cert. den. 400 U.S. 841 [27 L.Ed.2d 76, 91 S.Ct. 83].)

The third aspect of the confrontation requirement was clearly met in this case; the ability to observe Purdy's demeanor was fully provided the trier of fact.

Officer Miller's testimony of the statements made to him by Purdy, all involved reference to matters implicitly denied by Purdy in those several instances where he either responded to the prosecutor's questions with express denials, or with an "I don't remember," rather than a refusal to answer. Under such circumstances, the evidence was properly admitted pursuant to the hearsay exception provided by Evidence Code section 1235 and no critical denial of the right to confrontation occurred. Further, we note the additional indicia of credibility which may be given to the hearsay declarations of Purdy, in that Mrs. Booth, of the Booth farm, corroborated the fact that Purdy and Thomas were working in her fields at the same time, as related in the Purdy statement, and that they appeared to know and speak with each other. The reference in the statement to other Deloney credit cards was corroborated by Mr. Deloney's testimony.

## II

APPEAL OF JOSEPH CAMACHO BURCIAGO

Joseph's contentions on appeal, stated previously, are (1) the evidence is insufficient to support the verdicts on the two robbery charges—Ott and Simmons, in that both convictions are based on extremely weak identification testimony; (2) it was reversible error to deny Joseph's motion that the jury be shown the viewer in the door of Edna Hayes; and (3) reversible error resulted from the court's refusal to strike the

identification testimony of Leo Simmons after it was shown that the prosecution was unable to produce information of a photographic lineup held eight days after the crime.

## A. *Sufficiency of the Evidence*

■   At the outset we note that while Joseph does not contend that no evidence exists in support of these verdicts, he does argue that the supporting evidence fails to meet the standard for "substantial" evidence and further, that the substantial evidence rule, as applied by appellate courts in criminal cases in this state fails to accord defendant due process. For his latter contention, defendant refers us to the concurring opinion written by Justice Elkington in *People* v. *Blum* (1973) 35 Cal.App.3d 515, 521, 526-527 [110 Cal.Rptr. 833]. The argument made in support of the latter contention suggests that California appellate courts must determine not whether substantial evidence exists in support of the judgment, drawing all inferences permissible from the evidence and resolving all conflicts therein in favor of the judgment, but must instead determine whether a reasonable jury could have found proof beyond a reasonable doubt, or in other words, requires the appellate courts to reweigh the evidence presented. The mandate of the Supreme Court is to the contrary. (See e.g., *People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824]; *People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

■   The weight to be accorded the identification testimony of Mrs. Hayes, Mr. and Mrs. Simmons, and of Mrs. Ott, was a matter for the jury. That testimony was not, as defendant contends, merely enough to create a suspicion that Joseph perpetrated the crimes in question, but instead adequately supports the jury conclusion that he did so. All of the witnesses named had an opportunity to observe defendant. Three were able to describe him, describe his clothing, and identify a hat which appeared to be that which he had worn at the time of the offense. Mrs. Hayes, while unable to give a clear description to the police at the time on the night of the robbery, was able to identify Joseph in a most positive manner from a photographic lineup and to identify him at trial. And while her testimony at the preliminary may have been less than positive it was not valueless. She explained the manner in which distortion is created by the viewer in her door, i.e., that it is only when you look at it straight on that there is a distortion, but when viewed from the sides, the picture is clear.

The identification testimony of Mr. and Mrs. Simmons, is attacked primarily on the ground that Mr. Simmons was nearsighted and was not wearing his glasses at the time the robbery occurred. Defendant seems to be unaware of the fact that a person who is nearsighted, has better close than far vision, as opposed to a farsighted person, whose eyesight must be aided to improve his close vision. Further, Mr. Simmons never did make a positive identification of Joseph as his assailant, identifying him only as resembling the assailant. The weight of this testimony, together with that of Mrs. Hayes and Mrs. Simmons was for the jurors. Their determination was adverse to defendant and was based on competent evidence describing a combination of circumstances which, viewed together, meet the test which this court is compelled to follow. (See, e.g., *People* v. *Vann, supra,* 12 Cal.3d at p. 225.)

Defendant's major complaint with the identification testimony in regard to the Ott robbery is that Mrs. Ott's memory of her assailant immediately after the robbery was inferior to her later recollection. There is no question that she had had an ample opportunity to observe the man she saw on her service porch who pointed a gun at her, and who continually ordered her movements in her home during the crime. At the time she identified him from a photographic lineup she became visibly disturbed and apprehensive. Her in-court identification was quite positive. She commented at trial at having recalled a feature of his face, a turned down mouth, which validated both her photographic and in-court identification. Further, Mrs. Ott had indicated almost immediately after the robbery that while she could not describe the features of the two men, she thought she would recognize the smaller one, Joseph, if she ever saw him again. Defense counsel made very clear to the jury the fact that Mrs. Ott had read a newspaper story relating the arrests of defendants herein and identifying her as a victim in one of the crimes which they were believed to have committed. What effect this knowledge, and her increasingly positive state of mind that these were her assailants, had on her earlier photographic identification and subsequent trial identification, was for the jury to determine. Again, under the applicable rules of appellate review, the evidence was ample to support the conclusion reached by the jury.

B. *Denial of Request for a View of the Hayes' Door Viewer*

■ We reject defendant's claim that the court abused its discretion in denying Joseph's motion that the jury be allowed to view the Hayes' peephole. Defendant misconceives the record when he states that the

court's sole reason for denying the request was because it was not timely made and should have been made before trial. Defendant is quite correct, however, in asserting that the need for observation of the peephole may not have been as apparent prior to trial as it was when Mrs. Hayes testified that her vision through it was undistorted and clear. Mrs. Hayes' testimony was given on the seventh day of a fourteen-day jury trial. At the close of her testimony, Mrs. Hayes was excused. No request was made by counsel for Joseph, whose motion for view of the peephole had already been denied, that she be subject to recall for further examination.

At the time of ruling on the motion, the court had noted the availability to Joseph's counsel of means other than a view for providing the jury with ample information regarding the nature of the specific peephole in question. The viewer could have been removed from the door and Mrs. Hayes recalled to testify thereto; a similar peephole could have been brought before the jury, or direct evidence of the viewer and any distorting capacity could have been otherwise presented to the jury. Under these circumstances, it cannot be said that the court abused its discretion. (Pen. Code, § 1119; see e.g., *People* v. *Wheeler* (1971) 23 Cal.App.3d 290, 312 [100 Cal.Rptr. 198].)

C. *Denial of Defendant's Motion to Strike the Identification Testimony of Mr. Simmons*

Cross-examination of Mr. Simmons revealed that eight days after the robbery, he was shown photographs by police officers. He was unable to identify anyone from this group of photographs. There was a second photographic showup for Mr. Simmons and his wife sometime later in October or early in November, and again no identification was made. At the physical lineup which followed, Mr. Simmons picked defendant Joseph out as a possible culprit. At the conclusion of Mr. Simmons' testimony, counsel for Joseph moved to strike his testimony on the basis that no police reports were available which showed the composition of the first photo lineup. The district attorney stated that no police reports of this lineup were in the file and asserted that the matter was one for cross-examination. The court, acting primarily on the fact that no identification had resulted from the earliest photographic lineup, denied the motion to strike Mr. Simmons' testimony.

At no time did defendant make the argument presently asserted that Mr. Simmons' testimony should have been stricken because law enforcement authorities failed to preserve and produce evidence, as that

rule is enunciated in *People* v. *Hitch* (1974) 12 Cal.3d 641, 652 [117 Cal.Rptr. 9, 527 P.2d 361]; see also, *People* v. *Ruthford* (1975) 14 Cal.3d 399, 405-406 [121 Cal.Rptr. 261, 534 P.2d 1341]. Defendant's failure to assert this ground at trial precludes raising it presently. (See *People* v. *Fujita* (1974) 43 Cal.App.3d 454, 472 [117 Cal.Rptr. 757].) Absent presentation of a motion on this ground, the People were given no opportunity whatever to establish the circumstances which resulted in the now-complained-of nondisclosure and which would be of critical import in evaluating a contention based on the *Hitch* rationale on appeal. Further, the record fails to show any prejudice to defendant flowing from the nonavailability of this material at trial. (*People* v. *Mack* (1977) 66 Cal.App.3d 839, 859-860 [136 Cal.Rptr. 283].)

The judgments are affirmed.

Puglia, P. J., and Paras, J., concurred.

The petition of appellant Thomas Burciago for a hearing by the Supreme Court was denied July 13, 1978.