Filed 3/1/23  P. v. Scroggins CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B322702 |
| Plaintiff and Respondent, | (Tulare County Super. Ct. No. VCF380969) |
| v. | |
| RANDY SCROGGINS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Tulare County, Melinda Myrle Reed, Judge.  Affirmed in part and remanded with instructions.

Solomon Wollack, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Catherine Chatman, Supervising Deputy Attorney General, and Kimberley A. Donahue, Deputy Attorney General, for Plaintiff and Respondent.

Defendant and appellant Randy Scroggins (defendant) was charged, among other things, with attempted murder for shooting his wife, L.R., in the arm. Defendant moved for a mistrial and for a new trial, following conviction on the charges, contending his confrontation and due process rights were irreparably violated when L.R. briefly testified as a witness for the prosecution before she refused to testify further—and the trial court struck the testimony given and instructed the jury to disregard it. We consider whether the trial court correctly denied the mistrial and new trial motions, and we also decide a handful of sentencing issues—including whether recently passed legislation amending the Penal Code's multiple punishment bar (Penal Code section 654[1]) requires a remand to permit the trial court to decide whether to resentence defendant under the statute as amended.

## I. BACKGROUND

### A. *The Shooting and the Police Response*

In May 2019, defendant, L.R., and her children, I.M., Le.M., and La.M., lived in Farmersville, a city near Fresno.[2] Defendant and L.R. argued about L.R.'s Facebook account in their front yard. The argument became physical. L.R. bit defendant, and defendant slapped L.R.

Defendant and L.R. argued over her Facebook account again on May 22, 2019. Defendant's brother, Baudelio Luna (Luna), was also present at the house. Luna suggested defendant

---

[1] Undesignated statutory references that follow are to the Penal Code.

[2] I.M.'s age is unclear from the record. In an abundance of caution, we refer to I.M. as though he were a minor.

2

and L.R. take a break from arguing, and offered to drive L.R. and her children to another location.  Defendant agreed.  Luna, Le.M., and La.M. went outside to Luna's car.  Defendant exited the home and then reentered, locking the screen door behind him. As Luna, Le.M., and La.M. were loading the car, they heard a gunshot.

A few moments later, defendant and L.R. came toward the front door.  Defendant supported L.R., who had blood dripping down her arm as she opened the screen door.  L.R. said "the idiot shot me" after walking outside.  Defendant tried to get L.R. into a car to take her to the hospital.

Luna convinced defendant to give him his (defendant's) gun.  Luna ejected the clip and cleared the gun.  He then gave it to James, defendant's son, who took the gun inside his house, a separate home on the same property.

When I.M. arrived at the home and saw L.R. bloody and holding her arm, I.M. asked defendant why he shot L.R. Defendant admitted he shot L.R. but he did not explain why. I.M. called 911, and while he was on the phone, defendant said he was "done" and ran away, fleeing into nearby orchards.

Officer Ashley Hoppert of the Farmersville Police Department responded to the 911 call.  Upon arriving, Officer Hoppert observed L.R. rolling on the ground, wailing and screaming in pain.  L.R. told Officer Hoppert she had been shot with a black handgun.  Officer Hoppert observed a through and through gunshot wound below L.R.'s left wrist, and a wound to her left shoulder, which appeared to have a bullet lodged in it. L.R. stated she had been shot once and denied having brought her arm up when she was shot.  L.R. told Officer Hoppert she and defendant had been arguing for the last week over dumb stuff.

3

James Scroggins turned defendant's gun over to another police officer at the scene. A detective retrieved a single spent shell casing inside the home. Detective Richard Morley located defendant and took him into custody.

### B. Trial

In October 2019, the Tulare County District Attorney's Office charged defendant in a 12-count information. Six of the counts—attempted murder (count 1), assault with a firearm (count 2), false imprisonment (count 3), injuring a spouse (count 6), and cruelty to a child (counts 9 and 10)—were brought in connection with the shooting on May 22, 2019. Two of the counts related to acts defendant committed against L.R. on May 21, 2019, namely assault with a firearm (count 4) and dissuading a witness from reporting a crime (count 5). The remaining counts, for being a felon in possession of a firearm (count 7) and possession of ammunition (count 8), were based on actions taken on or about and between both dates.[3] Firearm, Three Strikes law, and prior felony conviction enhancements were also alleged.

At trial, I.M., La.M., Le.M., Luna, and James Scroggins testified, as did officers from the Farmersville Police Department and others involved in the investigation. Several of the witnesses testified to hearing defendant admit he shot L.R.—indeed, the fact of the shooting was not contested by the defense (the defense theory was the gun accidentally discharged when L.R. tried to disarm defendant so he would not commit suicide). The

---

[3] The trial court dismissed counts 9 and 10 prior to the commencement of trial. The court dismissed counts 3, 4, and 5 on the prosecution's motion during the trial.

4

prosecution also introduced evidence that Le.M. told an investigator that she saw defendant drag L.R. by the hair the day before the shooting and—after the shooting—heard defendant say "because she's a 'ho'" when asked why he shot L.R.[4]  In addition—as we now describe in greater detail in light of the principal issue raised on appeal—L.R. was also called as a witness.

### 1.  *The initial colloquy regarding whether L.R. will testify*

The prosecution called L.R. to testify.  After stating her name for the record and stating defendant was her husband, L.R. said she was choosing not to testify against her husband.  The prosecution asked the court to order L.R. to testify.

The trial court then informed L.R. that because the matter was a criminal proceeding, L.R. did not have the right to refuse to testify against her husband.  In response, L.R. asked if that was true under section 1219 of the "California Code."  The trial court told L.R. that if she did not testify the court would have the option of having her arrested and held in contempt of court, and L.R. could be incarcerated for up to six months.  L.R. questioned whether the contempt remedy applied and defendant interposed an objection but did not articulate a basis for it.

The trial court reiterated the law permitted L.R. to be found in contempt of court and incarcerated for the duration of

---

[4]    During her trial testimony, Le.M. claimed she lied to the investigator and maintained defendant did not make these statements.  She did acknowledge during her testimony, however, that defendant was "very abusive."

5

the trial or prosecuted for a longer amount of jail time. L.R. asked if she could assert marital privilege. The court maintained she could not and reiterated that if she did not testify she would be subjecting herself to criminal prosecution and incarceration. L.R. acquiesced and agreed to testify.

Counsel for defendant asked to "make a record." The court said counsel could be heard later, and overrode his subsequent attempt to interject, stating they were bringing in the jury.

### 2. L.R.'s testimony

Under questioning from the prosecutor, L.R. testified that at some point toward the beginning of the day on May 22, defendant came into their bedroom and woke her up and they began arguing about Facebook, a topic about which they had been arguing for a month. (Earlier in the week, L.R. left the house for a few hours and went to her daughter's residence. L.R. returned home because things had calmed.) They moved the argument into the garage, where they remained for two to three hours.

When asked, L.R. said she did not recall speaking to a Deputy Gates; she also testified reviewing a transcript of her statement to Deputy Gates did not refresh her recollection. L.R. denied telling the deputy she returned to the home because defendant threatened to hurt her children if she did not. When the prosecutor stated she had said those words, L.R. said she did not remember. She denied telling Deputy Gates that defendant was going to hurt himself and had a gun. She also denied there was an incident between her and defendant involving a firearm on May 21 in which defendant pushed a gun against her head. L.R. also denied pointing out for the deputy the area on her head where defendant pushed the gun or claiming it left a mark. L.R.

6

additionally denied seeing defendant with a gun prior to May 22 and asking to leave the garage that day when arguing with defendant.

L.R. testified she wanted to stop fighting with defendant and leave the situation alone. When asked about a prior statement in which she said defendant got angrier and more violent, and then went outside, grabbed a crowbar, and tried to hit her with it, L.R. said the part about the crowbar was untrue.

L.R. stated that after the argument in the garage, she went back into the house and slept for a few hours, until the afternoon. L.R. said a document describing her prior statements was not true when it said defendant dragged her by the hair. She said she did not remember her kids seeing it and stopping defendant.

L.R. testified she was grabbing her stuff to leave when she learned Luna was going to take her and the children somewhere else. Le.M. and La.M. were outside already, and Luna walked outside as well.

### 3. *The trial court correctly advises L.R.*

The trial court took a recess at this point in L.R.'s testimony. Defendant requested to make an argument outside of the presence of the jury regarding a mistrial. The trial court stated it intended to proceed. Defendant objected to not being able to make a record. The court then invited counsel to sidebar.[5]

At sidebar, the prosecutor agreed with defense counsel that Code of Civil Procedure section 1219, subdivision (b), specified

---

[5] The conversation at sidebar was not reported. Defendant obtained a settled statement regarding the content of the sidebar conversation.

7

the maximum punishment for a domestic violence victim's refusal to testify is a fine. Defendant requested a mistrial. The trial court did not grant a mistrial and stated it would correctly advise L.R. of the consequences of her refusal to testify. Defendant then requested counsel be appointed for L.R. The court denied the request and indicated that if L.R. refused to testify, her testimony would be stricken from the record and the jury would be instructed to disregard it.

After concluding the sidebar, the court stated for the record that counsel agreed the maximum punishment L.R. could face for refusing to testify against defendant was a $10,000 fine, not jail time. L.R. asked the court to clarify whether a $10,000 fine would definitely be imposed. The court said no and explained the chain of potential consequences of refusing to testify. L.R. then requested and received a minute to consider the court's updated advisement. She ultimately decided she would not testify against defendant.

### 4. Subsequent proceedings concerning L.R.'s testimony

When the jury returned to the courtroom, the trial court informed the jury L.R. had left the witness stand and stated it was striking L.R.'s testimony. The court instructed the jury not to consider the testimony during the course of the trial, or to allow it to affect their verdict. L.R. later confirmed in the presence of the jury that she was choosing not to testify.

Defendant orally moved for a mistrial, arguing L.R.'s testimony was highly prejudicial, particularly the testimony regarding prior bad acts for which there were no other witnesses. Defendant argued there was no way to "unring the bell," and

8

contended he would be deprived of a fair trial. The trial court denied the motion.

When the trial court instructed the jury, it reminded the jury it had stricken L.R.'s testimony from the record and again instructed the jury to disregard it and not consider it for any purpose. The court also instructed the jury that nothing the attorneys say is evidence and their questions are not evidence. It further instructed the jury not to "assume something is true just because one of the attorneys asked a question that suggested it was true."

Defendant subsequently asked the trial court to state on the record the reasons for its denial of his request for a mistrial. The trial court did so, explaining the evidence against defendant through the examination of other witnesses was strong and complete. The court opined that, if anything, L.R.'s stricken testimony was favorable to defendant because she denied any criminal wrongdoing on defendant's part. The court additionally emphasized it had stricken the testimony, admonished the jury to disregard it, and had reminded the jury of that during its recitation of the jury instructions. The court concluded there was nothing about L.R.'s aborted testimony that unfairly advantaged the prosecution.

D. *Verdict and Sentencing*

1. *Verdict*

The jury found defendant guilty of attempted murder (count 1) and found true associated allegations that defendant personally and intentionally discharged a firearm that caused great bodily injury to L.R., that defendant personally and intentionally discharged a firearm, that defendant personally and

9

intentionally used a firearm, and that defendant personally inflicted great bodily injury on L.R. The jury also found defendant guilty of assault with a firearm (count 2) and injuring a spouse (count 6). As to both of those counts, the jury found true allegations that defendant personally and intentionally used a firearm and personally inflicted great bodily injury on L.R. Finally, the jury found defendant guilty of being a felon in possession of a firearm (count 7) and of possession of ammunition (count 8). The trial court separately found true allegations that defendant sustained three prior convictions qualifying as "strikes" under the Three Strikes law.

### 2. *Motion for new trial*

After the verdicts, defendant filed a motion for new trial based on the trial court's incorrect advisement to L.R. concerning the consequences of declining to testify and the decision to overrule the defense objection prior to L.R.'s (misadvised) decision to testify. The trial court acknowledged its instruction to L.R. stating she could be imprisoned for refusing to testify against defendant was clearly erroneous. But it found the error had not resulted in a miscarriage of justice. In so finding, the court reasoned L.R.'s testimony consisted primarily of denials of defendant's wrongdoing during the days preceding the shooting and noted there were no subsequent witnesses called to impeach those denials. The court also emphasized its decision to strike the testimony immediately after L.R. declined to testify further, the multiple admonitions it gave the jury to disregard L.R.'s testimony, and the strength of the other evidence against defendant, which the court believed was overwhelming.

10

### 3.    *Sentencing*

The trial court sentenced defendant to a total of 81 years to life in prison.  On the attempted murder conviction (count 1), the court imposed a sentence of 42 years to life pursuant to section 1170.12, subdivision (c)(2)(A)(iii), plus 25 years to life for discharge of a firearm causing great bodily injury (§ 12022.53, subd. (d)) and 10 years for defendant's two prior serious felony convictions.  On the felon in possession of a firearm conviction, the court imposed a term of four years, consecutive to the sentence on count 1.  Sentences and enhancements on the assault with a firearm, injuring a spouse, and possession of ammunition convictions (counts 2, 6, and 8) were either ordered stricken or imposed and stayed pursuant to section 654.

Defendant was ordered to pay a restitution fine in the amount of $10,000 pursuant to section 1202.4.  The court also imposed a court operations assessment in the amount of $240 and a criminal conviction assessment in the amount of $180.

Defendant asked the court to stay all fines and fees until the People proved he had the ability to pay them.  The court said it was not inclined to stay the fines because defendant had the ability to work in prison.  The court referenced a letter from a friend and sometime co-employee of defendant indicating defendant was a good worker, and concluded defendant should be able to meet the demands of the fines while incarcerated.[6]  Defendant argued he would not likely earn a gainful income

---

[6]    The letter, which addressed defendant's overall character, stated in pertinent part that defendant was willing to jump in and help at work and never turned down work.  It also generally stated defendant "has always worked hard."

because the prison work program is not a regular salary, he would be in prison for a very long time, and there was no reasonable likelihood he would be able to pay. The court found defendant had the ability to earn and pay all the fees and fines imposed.

Defendant represented he had accrued 412 days of custody credits, and he was credited in that amount.

## II. DISCUSSION

The trial court did not err by denying defendant's mistrial motion and motion for new trial. Once it became clear L.R. would not testify further—and that defendant would accordingly be unable to cross-examine her—the trial court struck her testimony in its entirety and instructed the jury to disregard it. The court repeated that instruction again at the close of evidence and further instructed the jury that questions asked by an attorney are not evidence. These remedial measures were sufficient to dispel any need for a mistrial or new trial under the circumstances; L.R. said nothing that was so prejudicial that the jury could not be expected to comply with the court's instructions. (In fact, as the trial court observed, most of L.R.'s testimony— which was never impeached by another witness—was favorable to defendant.)

As for defendant's sentencing contentions, we believe the trial court's determination that defendant has the ability to pay the fines and fees it imposed was sufficiently supported by the record. But we agree with the parties that defendant's judgment must be modified in several clerical respects and the cause should be remanded to give the trial court the opportunity to exercise newly conferred discretion under section 654 if it so chooses.

12

*A.    The Trial Court Was Not Required to Grant a
        Mistrial or New Trial*

The parties agree the trial court initially erred by
instructing L.R., a victim of domestic violence, that she could be
imprisoned for refusing to testify.  (Code Civ. Proc., § 1219, subd.
(b).)  The trial court itself recognized its error during L.R.'s
testimony, re-advised L.R. with accurate information, struck her
testimony, and ordered the jury not to consider it.  The question
we resolve is whether constitutional due process and
Confrontation Clause considerations require affording defendant
a new trial notwithstanding the trial court's measures to remedy
its error.  Our review of the denial of a motion for mistrial or new
trial is for abuse of discretion.  (*People v. Bell* (2019) 7 Cal.5th 70,
121 ["In general, 'a motion for mistrial should be granted only
when "'a party's chances of receiving a fair trial have been
irreparably damaged.'"' [Citation.] 'We review a ruling on a
mistrial motion for an abuse of discretion.  [Citations.]  A trial
court should declare a mistrial only "'if the court is apprised of
prejudice that it judges incurable by admonition or instruction.'"
[Citation.]  "In making this assessment of incurable prejudice, a
trial court has considerable discretion"'"]; *People v. Lightsey*
(2012) 54 Cal.4th 668, 729 ["'"We review a trial court's ruling on a
motion for a new trial under a deferential abuse-of-discretion
standard"'"].)

*1.    Confrontation rights*

Relying primarily on *People v. Shipe* (1975) 49 Cal.App.3d
343 (*Shipe*), defendant contends his confrontation rights were
violated and he was irreparably prejudiced by the violation.  In
*Shipe*, the police arrested the defendant and two other men for

13

murdering a drug dealer.  (*Id*. at 345-346.)  The other men pled guilty to being accessories after the fact, and the prosecutor subsequently called them as witnesses at the defendant's trial.

Each of the men answered preliminary questions but then asserted the Fifth Amendment when the prosecutor began asking questions about the incident.  (*Shipe*, *supra*, 49 Cal.App.3d at 346.)  The court determined the witnesses did not have the right to assert the Fifth Amendment privilege and ordered them to answer.  The prosecutor asked both witnesses leading questions such as, "'Is it not true that . . . you came back and saw the body of [the victim and] that [the defendant] was on top of him?'" and "'Is it not further true . . . that in your presence [the victim] was stabbed multiple times by your brother, [the defendant]?'"  (*Id.* at 347-348.)  By asking these questions, "the prosecutor placed before the jury information which overwhelmingly established [the defendant] as the murderer, provided a narcotics-related motive for the crime, and provided a basis for the inference that two witnesses had revealed this information in their statements to the authorities."  (*People v. Burciago* (1978) 81 Cal.App.3d 151, 164.)

The *Shipe* court reversed the conviction and held the prosecutor's questions violated the defendant's Confrontation Clause rights.  (*Shipe*, *supra*, 49 Cal.App.3d at 349, 355.)  The court called the prosecutor's questions "flagrantly suggestive" and stated a prosecutor may not, "under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony."  (*Id.* at 351, 349.)  The court also concluded the People could not demonstrate the confrontation violation did not contribute to the verdict obtained because the

14

evidence of the defendant's guilt was "entirely circumstantial." (*Id.* at 355.)

The pertinent facts in *Shipe* differ from the facts here in two key respects. First, in *Shipe*, the testimony in question was not stricken. (*Shipe, supra,* 49 Cal.App.3d at 346-349.) Here, by contrast, the trial court struck the entirety of L.R.'s testimony and instructed the jurors they were not to consider her testimony or allow it to affect their decision. During its delivery of jury instructions, the trial court reminded the jury it had stricken L.R.'s testimony and again instructed it to disregard the testimony. The trial court also instructed the jury that the attorneys' questions were not evidence, and not to assume something was true because an attorney's question suggested it was true. These differences are important because "[t]he assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." (*Tennessee v. Street* (1985) 471 U.S. 409, 415, fn. 6; accord, *People v. Smithey* (1999) 20 Cal.4th 936, 962 [holding the defendant was not denied his right to confrontation where "the jury was instructed to disregard all questions regarding defendant's intent and any answers"].) As a result, we assume the jury followed the court's instructions.

Second, in *Shipe*, there was no significant independent evidence of guilt other than what was brought out by the challenged questioning. (*Shipe, supra,* 49 Cal.App.3d at 355 ["The evidence of appellant's guilt was entirely circumstantial . . ."].) Here, however, the other evidence of defendant's guilt on the crimes of conviction was strong. Defendant was the only person in the home with L.R. at the time of the shooting. After she was shot, L.R. identified defendant as

15

the person who shot her, and defendant admitted the same to I.M. Defendant and L.R. had been fighting the week of the shooting, and one of their arguments turned violent. Though L.R. had two wounds, one below her left wrist, which the bullet went through, and a wound to her left shoulder, where the bullet lodged, the evidence reflected only one shot was fired. The jury could properly find based on all this evidence (and Le.M.'s statement to the investigator about defendant's post-shooting "because she's a ho" statement) that defendant attempted to kill L.R. and she raised her arm to shield herself when defendant fired (though L.R. denied this). (See, e.g., *People v. Smith* (2005) 37 Cal.4th 733, 741-742 [act of firing a gun toward a victim at a close, but not point blank, range is sufficient to support an inference of intent to kill where the shot could have inflicted a mortal wound had the shot been on target].)

In contrast to *Shipe* and the other cases on which defendant relies, the facts here are more akin to those found in *People v. Morgain* (2009) 177 Cal.App.4th 454 (*Morgain*). That case holds a defendant's right to confrontation was not violated where a witness was granted use immunity and ordered to testify but refused to answer a handful of questions posed by the prosecutor, including whether the defendant told her that he shot the victim. (*Id*. at 459-462.) The trial court in *Morgain*, like the trial court here, granted the defendant's motion to strike the entirety of the witness's testimony and instructed the jury not to consider the prosecution's questions as evidence. (*Id*. at 462, 465.) The *Morgain* court held the defendant suffered no infringement of his Confrontation Clause rights requiring retrial because the trial court struck the witness's testimony, because the court instructed the jury not to consider the prosecution's

16

questions as evidence, and because there was independent evidence of defendant's guilt. (*Id.* at 465-466.) The facts here are analogous and we reach the same conclusion.

### 2. *Due process*

Defendant also contends his Fourteenth Amendment due process right to a fair trial was violated by L.R.'s testimony. In so arguing, defendant acknowledges that, generally, "the admission of improper evidence is harmless if it is subsequently stricken out and the jury is told to disregard it." (*People v. Sourisseau* (1944) 62 Cal.App.2d 917, 929.) However, he contends L.R.'s testimony was so prejudicial that striking it and admonishing the jury to disregard it could not cure the error.

In support of this argument, defendant cites a handful of cases in which appellate courts have held a mistrial should have been granted on significantly different facts. (See, e.g. *People v. Allen* (1978) 77 Cal.App.3d 924, 934-935 [reference to the defendant's parole status was not cured by trial court striking testimony and admonishing jury where the evidence presented an extremely close case] (*Allen*); *People v. Ozuna* (1963) 213 Cal.App.2d 338, 339, 342 [admonition to jury did not remove harmful effect of testimony referring to defendant as "ex-convict"; evidence was not strong enough to preclude finding of innocence] (*Ozuna*); *People v. Bentley* (1955) 131 Cal.App.2d 687, 689-690 [curative admonition insufficient where police witness in child sexual abuse case improperly revealed defendant's suspected involvement in prior similar cases and another witness revealed the defendant "trie[d] to date up all the married women in the neighborhood"] (*Bentley*); *People v. Navarrete* (2010) 181 Cal.App.4th 828, 834 [curative instruction could not undo

17

prejudice where jury was likely to interpret testimony to mean the defendant made a confession of guilt] (*Navarrete*).) All of these cases involve "exceptional" circumstances in which "'the improper subject matter is of such a character that its effect . . . cannot be removed by the court's admonitions.' [Citation.]" (*Allen, supra,* 77 Cal.App.3d at 935.) The testimony in *Allen* and *Ozuna*, for instance, improperly revealed the respective defendants had prior convictions. The subject testimony in *Bentley* indicated the defendant, charged with child abuse, had previously been suspected of abusing another child. And the testimony in *Navarrete* suggested the defendant had confessed to the crime. Here, by contrast, L.R.'s answers to questions before refusing to testify further mainly augmented testimony by other witnesses establishing that she and defendant had been arguing, and one of those arguments had turned physical. That is not an "exceptional" circumstance like those in the cited cases.[7]

### B.    *Ability to Pay Fines and Fees*

Defendant asks us to order his restitution fine and other assessments stayed pursuant to *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*)—unless or until the People prove his ability to pay. Defendant argues substantial evidence does not support the trial court's conclusion that defendant could obtain

---

[7]    Defendant additionally asserts that "refusal to entertain [trial] counsel's timely objections constituted error in its own right." Even if that were correct, the error was not prejudicial—as our merits analysis demonstrates.

18

paid work in prison and was thus capable of paying his fines and fees.

Our Supreme Court has granted review to decide whether a court must consider a defendant's ability to pay before imposing or executing fines, fees, and assessments and, if so, which party bears the burden of proof. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) For purposes of this appeal, we assume that *Dueñas* was correctly decided.[8]

The record reflects that at the time of sentencing defendant was 44 years old, had previously been employed as a truck driver, and was a hard worker. The trial court sentenced defendant to an aggregate term of 81 years to life. Based on these facts, the trial court could reasonably rely on defendant's ability to earn prison wages, even if those wages are low, to find he had the ability to pay. (See *People v. Jenkins* (2019) 40 Cal.App.5th 30, 41 ["[I]t is entirely appropriate to consider the wages defendant may earn in prison on the inability-to-pay issue."]; *People v. Ramirez* (1995) 39 Cal.App.4th 1369, 1377 [a trial court may consider the defendant's future ability to pay, including his ability to earn wages while in prison].) Defendant argues there was no evidence demonstrating whether he would be eligible for a prison work program, when he would be able to begin working, how many hours he would work, or the pay rate he would receive. He further argues that, at an estimated rate for a mid-level job in prison, he would have to substantially outlive his life expectancy in order to pay off his fines and assessments. None of these

---

[8]     We therefore do not address the People's argument that the issue should be analyzed under the excessive fines clause of the Eighth Amendment rather than under the Due Process clause.

19

arguments demonstrate, however, that the trial court's imposition of fines and fees was erroneous. (See, e.g., *People v. DeFrance* (2008) 167 Cal.App.4th 486, 505 [defendant did not show inability to pay $10,000 restitution fine simply because prison wages would make it difficult, it would take a long time, and the fine might never be paid].)

### C. *Calculation of Assessments and Custody Credits*

Defendant argues, the People concede, and we agree, that the court operations assessments and criminal conviction assessment imposed must be modified. Penal Code section 1465.8, subdivision (a)(1) imposes a $40 per count assessment to help pay for court operations. Government Code section 70373, subdivision (a)(1) sets forth an assessment of $30 per felony count in order to pay for court facilities. Defendant was convicted on five counts. Accordingly, the trial court should have imposed $200 in fees under section 1465.8 and $150 in fees under Government Code section 70373.

The trial court awarded defendant 358 days of custody credit and 54 days of conduct credit, based on the calculations provided to the court at the sentencing hearing. Defendant was arrested on June 2, 2019, and sentenced on May 26, 2020. Defendant is entitled to actual custody credit for all days in jail, including partial days. (*People v. Valdes* (2020) 53 Cal.App.5th 953, 955.) As the parties agree, the calculation of the custody credit days provided to the court at sentencing undercounted defendant's actual custody credits by two days. Accordingly, on remand, the court must ensure defendant receives 360 days of actual custody credit, plus 54 days of conduct credit, for a total of 414 days.

### D. Assembly Bill 518

In a supplemental brief, defendant argues the matter should be remanded to the trial court to allow it to determine whether to exercise its discretion under Assembly Bill 518, which became effective on January 1, 2022. The People agree, conceding Assembly Bill 518 applies to defendants' case retroactively.

Prior to Assembly Bill 518, section 654 provided that an act or omission punishable under multiple provisions of law must be punished only under the provision carrying the longest term of imprisonment. (Former § 654 ["An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision"].) Assembly Bill 518 amended section 654 to give trial courts the authority to impose punishment under either of two provisions that permit punishment of the same act, i.e., without being constrained to choose the punishment carrying the longest term of imprisonment. (§ 654 ["An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision"].)

In this case, defendant was convicted of multiple crimes arising out of the same act, and the trial court sentenced him in accordance with the requirements of section 654 as it existed at the time. We agree that Assembly Bill 518 applies retroactively to defendant's case. (See e.g., *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 307, 309 [new laws granting courts discretion to ameliorate punishment should be applied

21

retroactively to "'every case to which it constitutionally could apply'" even if it is only exercised in some cases].)

Accordingly, defendant is entitled to a limited remand to permit the trial court to determine whether to exercise its discretion under section 654 as amended. On remand, the trial court should hold a hearing with defendant present (unless his presence is waived) to determine whether to exercise its discretion to modify the original sentence. If the court opts to impose a lesser term than initially imposed, the court should proceed with a full resentencing. If the court decides not to exercise its discretion to impose a lesser sentence, the prior sentence is to remain in effect, and defendant need not be resentenced but should be remanded to continue serving the term previously imposed (with the corrections in the abstract of judgment we have already outlined). (*Peracchi v. Superior Court* (2003) 30 Cal.4th 1245, 1255; *People v. Buckhalter* (2001) 26 Cal.4th 20, 35.)

DISPOSITION

Defendant's convictions are affirmed and the cause is remanded for further proceedings consistent with this opinion.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, Acting P. J.

We concur:


MOOR, J.


KIM, J.

23