[No. A121530. First Dist., Div. Five. Sept. 4, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MARKEL RAY MORGAIN, Defendant and Appellant.

## Counsel

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Christopher J. Wei, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**JONES, P. J.**—The People charged appellant Markel Ray Morgain with first degree murder (Pen. Code, § 187).[1] At trial, appellant's girlfriend, Marquita Wallace, refused to answer questions about the incident and the trial court struck all of her testimony. The court, however, permitted the prosecutor to contend during closing argument that Wallace refused to testify to protect

---

[1] Unless otherwise noted, all further statutory references are to the Penal Code.

appellant. A jury convicted appellant and the court sentenced him to 51 years to life in state prison.

Appellant challenges his conviction on several grounds. First, he contends the court violated his Sixth Amendment right of confrontation by permitting the prosecutor to continue to question Wallace after she made it clear she would not answer any additional questions. Second, he argues the court violated his constitutional rights to confrontation and due process by allowing the prosecutor, during closing argument, to urge the jury to draw a negative inference from Wallace's refusal to testify. Finally, appellant claims he is entitled to an additional day of presentence custody credit.

We agree with appellant's final contention and conclude he is entitled to 249 days of presentence custody credit, not 248 days. In all other respects, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Incident*

On June 18, 2007, appellant's cousin, Cecil Walker, was at his apartment on Trigger Road in Rodeo when he heard noise behind the apartment complex. He walked outside and saw appellant playing dice behind the complex with several people, including Corey "Corndog" Tidwell.[2] Walker noticed appellant was wearing a white T-shirt and jeans and wore his hair in short cornrows that were "close to the head." Walker wore similar clothing, but his hair was in a close shave.

Walker saw appellant pull a gun from his waist and point it at Tidwell. Walker heard gunshots; then Tidwell yelled, "Quit, Boo" and "Don't do it. Don't do it, not me." Walker ran away because he was "[a]fraid of shots being fired and one hit[ting] [him]." He did not have a gun and did not shoot Tidwell. During an interview with Detective Michelle Day, Walker initially lied about witnessing the incident because he feared being perceived as a "snitch." Walker eventually told Day what he saw. At trial, Walker admitted being a convicted felon and receiving immunity for his testimony.

On the day of the incident, 12-year-old Eli. was at her friend Michelle's residence at the apartment complex on Trigger Road when she saw a Black

---

[2] Appellant's nickname is "Boo." There were at least two other men playing dice that day, including Steve and "Ant."

man behind the complex. The man was pointing a gun at Tidwell. Tidwell ran and Eli. heard one or two gunshots. Tidwell slipped and fell to the ground; the man ran up to him and shot him several times. Then he took money from Tidwell's wallet and ran. The man was about six feet tall and wore his hair in eye-level dreadlocks. Detective Day showed Eli. a picture of appellant and she recognized him as the person who shot Tidwell. She also told Day, however, that appellant "[k]ind of" looked like the man who shot Tidwell. Eli. was not able to identify appellant at trial and conceded she did not want to testify because she was scared. Eli. did testify, however, that Walker did not shoot Tidwell.

Michelle was at the apartment complex with Eli. when she heard four or five gunshots. She looked out her apartment window and saw Tidwell on the ground; then she saw a man run up to Tidwell and start shooting at him. The shooter went through Tidwell's pockets and ran toward the back of the apartment complex. Michelle did not get a good look at the shooter's face, but she saw he was a light-skinned Black man. She thought the shooter had "a little bit of hair" but not dreads or "twisties."[3] Michelle was not able to identify the shooter when she spoke to police after the incident.

Brittany Tozier-Ricketts was in her apartment when she heard "fire cracker sounds." She looked out her front door and saw three men, one of whom had a gun in his hand. She saw the victim run and the man with the gun shoot in the victim's direction. The third man—who did not have a gun—ran along a path between two buildings. At that point, the shooter "fire[d] off a couple more rounds." Ricketts was unable to see more because her mother-in-law and sister-in-law blocked her view.

According to Ricketts, the shooter was Black, had a "[l]ight to medium" skin tone, and was wearing a white T-shirt and jeans. He had short hair that "looked like it was shaved closely to the head." Ricketts did not pay much attention to the shooter's hair, but she remembered it "looked kind of short" and was not braided. Ricketts did not get a good look at the shooter's face and was unable to identify him in a photo lineup. At trial, Ricketts testified that although she could not be sure, appellant looked similar to the shooter because of his hair, skin tone, and build. ·

Ricketts's mother-in-law, Lynda Tozier, was also in her apartment when she heard what she thought were firecrackers. Tozier called 911 and ran

---

[3] "Twisties" or "twistees" occur when a person takes a portion of hair and "just twist[s] it." Twisties are somewhat similar in appearance to dreadlocks.

outside. She saw Walker in the parking lot, running towards his apartment. He did not have a gun in his hands. She also saw another man "running around back of the apartments." She did not see the other man's face or hands but she noticed he was wearing a white T-shirt and jeans and had a "close-shaved" hairstyle. After the two men ran away, Tozier walked toward the victim's body and noticed he was "already deceased."

Tozier's daughter, Chartina, saw a Black man shoot at Tidwell, go through his pockets, and run away. Chartina did not get a good look at the shooter's face, but she noticed he was between five feet nine inches and six feet tall, had a relatively slender build, and had a short, clean-cut hairstyle. The shooter did not have dreadlocks or "twisties." The shooter had a medium skin tone and wore a white T-shirt and jeans. At trial, Chartina testified that appellant's skin tone, hair, and height looked similar to the shooter's.

Tidwell's stepson saw several people, including appellant and Tidwell, playing a game of dice on the day of the incident. Appellant was wearing blue jeans and a white T-shirt and wore his hair in "twistees" which hung down to his earlobes.

### The Investigation

Detective Day investigated the incident. She determined appellant was 25 years old, five feet nine inches tall, and weighed approximately 165 pounds. Appellant had "short hair, possibly cornrows . . . [with] some little braids hanging down" a few inches below his ears. Day showed Eli. a photo lineup; when Eli. saw appellant's picture, she gasped, "her eyes got big, and she nodded her head up and down in a yes motion." Eli. said she saw appellant at the YMCA earlier that week and again on the day of the incident, " '[w]hen he shot' " Tidwell. Eli. also said appellant had "short dreads" on the day of the incident. She told Day, however, she could not be completely sure appellant was the person who shot Tidwell because a lot of people in the neighborhood look alike. Police found the handgun used during the incident but were unable to locate any fingerprints or DNA on it.

### Marquita Wallace's Refusal to Testify

The People advised the court they intended to call Wallace, appellant's girlfriend, as a witness at trial. They sought—and obtained—a subpoena on the grounds that she was a material witness because she told police appellant confessed to the shooting. The police located Wallace and kept her under house arrest until trial.

Before trial, defense counsel filed a motion in limine asking the court to "resolve the prosecution's primary witness, Marquita Wallace's issue on whether she will exercise her Fifth Amendment right and not testify, whether the prosecution will grant her immunity or whether she will refuse to comply with any court order compelling her to testify." Defense counsel contended that if Wallace chose not to testify, "any and all previous statements [she] made to police concerning Mr. Morgain's involvement [in the incident] should be excluded as a violation of his Sixth Amendment Right and Due process rights to confront . . . witnesses against him . . . ."

At the hearing on the motion, Wallace's counsel informed the court that if called to testify, Wallace would invoke her privilege against self-incrimination because of a pending felony charge. The court advised the parties that if Wallace asserted the privilege, it would permit the prosecution to offer Wallace immunity. If the prosecution offered Wallace immunity, then "she'll be given that [immunity] and instructed to answer the questions. We'll bring in the jury. We'll have her asked questions and see what she does." If Wallace continued to refuse to answer, the court stated it would "order [her] to answer . . . with the penalty of possibly being held in contempt, and we'll see what she does, and then we'll go from there."

During trial, Wallace informed the court she would refuse to testify even if the prosecutor granted her use immunity. After the prosecutor agreed to grant Wallace immunity, the court ordered her to testify. Wallace took the witness stand and testified she was appellant's girlfriend and the mother of his child. Wallace stated she lived with appellant when the incident occurred. When the prosecutor asked Wallace whether she knew a man named Victor Campbell, she responded, "I ain't answering it." After the court ordered Wallace to answer the question, she admitted Campbell was her cousin and that he spent time with appellant. Wallace also testified Campbell did not come to her house on the day of the shooting and that appellant did not tell her he and Campbell were going to Walker's house.

When Wallace stated she did not recall talking to the police after the incident, the prosecutor showed Wallace a statement she made to police to refresh her recollection. Wallace said the statement did not refresh her recollection, and the following colloquy occurred:

"PROSECUTOR: Okay. Didn't you tell the police, Ms. Wallace, that . . . Campbell came over to your house on the day of Tidwell's shooting? You told that to the police, didn't you?

"WALLACE: No, I did not.

"PROSECUTOR: And you told the police, didn't you, Ms. Wallace, that . . . the defendant, the father of your child, told you that he and Campbell were going to go over to his cousin's, [Walker's] house that day?

"WALLACE: No.

"PROSECUTOR: You never told that to the police?

"WALLACE: No.

"PROSECUTOR: You, in fact, were not happy about the defendant going over to . . . Walker's house with [Campbell], were you?"

Wallace asked to speak with her lawyer. After she did so, the prosecutor continued questioning her.

"PROSECUTOR: You weren't happy, Ms. Wallace, that Mr. Morgain . . . was going over to Cecil Walker's house with Mr. Campbell, were you? [¶] . . .

"WALLACE: Not answering it. . . . [¶] . . .

"PROSECUTOR: Okay, you weren't happy, Ms. Wallace, that Mr. Morgain was going over to Cecil Walker's house with Mr. Campbell, were you?

"WALLACE: Not answering it. I refuse to answer.

"PROSECUTOR: Did the defendant tell you he shot [Tidwell]?

"WALLACE: Not answering it.

"PROSECUTOR: Did he tell you that he shot him in the hand? Did he tell you that he shot [Tidwell] in the hand, Ms. Wallace?"

At that point, counsel for Wallace objected that the prosecutor was badgering the witness. The court overruled the objection and ordered Wallace to answer the question. The prosecutor then asked:

"PROSECUTOR: Did the defendant tell you that after he shot [Tidwell] in the hand that the victim then said, 'No man, don't shoot me, don't shoot me, don't shoot me.' Did he tell you that? . . .

"WALLACE: [No response.]

"THE COURT: Ms. Wallace, I'm going to order that you answer that question or you'll be held in contempt.

"WALLACE: I'm not answering it.

"THE PROSECUTOR: Did the defendant tell you that he then shot him four more times? Did he tell you that he then shot [Tidwell] four more times?"

The court overruled defense counsel's due process and confrontation clause objections and ordered Wallace to answer the question. She refused and, outside the presence of the jury, the court held her in contempt.

Later in the trial, defense counsel moved to strike Wallace's testimony. The court granted the motion and struck Wallace's testimony. It permitted the prosecutor, however, to argue the jury could infer from Wallace's refusal to testify that she was "doing it to cover up for the defendant." The court explained the prosecutor could "argue the inference that her refusing to testify with no legal right to do so, is she's doing it on behalf of—she has a motive to protect Mr. Morgain." The court, however, precluded the prosecutor from "discuss[ing] specific testimony" because defense counsel "never had an opportunity to cross[-examine Wallace]." Defense counsel did not object to the court's ruling.

### Closing Argument

Before closing argument, the court informed the jury it was striking Wallace's testimony "entirely." During his rebuttal argument, the prosecutor noted the "overwhelming impact of Marquita Wallace and her significance in this case. [¶] Marquita Wallace refused to testify, and you can consider that. . . . And . . . the only reasonable interpretation . . . [is] that she is protecting the defendant. And you can consider that. And you are entitled to consider that. You can. [¶] The smoke screen that was put up by the defense . . . is just parted when one looks at all of the evidence, every witness, and then Marquita Wallace as well, who is clearly, based upon the evidence, and the reasonable interpretation, the only thing she's protecting him by refusing to testify and simply answer basic questions." The prosecutor then commented, "the issue is protecting from what? Protecting from conviction. Because in this case the defendant, in fact, committed the murder." Defense counsel did not object.[4]

---

[4] At trial, the court admitted an audiotape and transcript of appellant's jailhouse conversation where appellant spoke to another man and told him "mum's the word," and that a man named "Super Dog" needed to "hit his mute button." Appellant then stated Super Dog was planning to "be there Thursday" and asked whether anyone had visited Super Dog or spoken to

After deliberating for three days and requesting readback of certain testimony, the jury convicted appellant of first degree murder. The court sentenced appellant to 51 years to life in state prison with 248 days of presentence custody credit.

## DISCUSSION

### *Questioning Wallace in the Presence of the Jury Did Not Violate Appellant's Right of Confrontation*

■ Appellant contends the court violated his right of confrontation when it permitted the prosecutor to ask Wallace whether she told police appellant confessed to the shooting. Under the confrontation clause of the Sixth Amendment, a defendant has the right to confront and cross-examine witnesses presented against him. (*Douglas v. Alabama* (1965) 380 U.S. 415, 419 [13 L.Ed.2d 934, 85 S.Ct. 1074] (*Douglas*).) A defendant's confrontation rights may be violated where a prosecutor examines a recalcitrant witness and poses questions that relate to prior statements made by that witness, in circumstances where the witness's recalcitrance effectively prevents cross-examination concerning those prior statements. (See, e.g., *People v. Rios* (1985) 163 Cal.App.3d 852, 864 [210 Cal.Rptr. 271], fn. omitted ["the admission of a prior statement made by a witness who stonewalls at trial and refuses to answer any question on direct or cross-examination denies a defendant the right to confrontation which contemplates a meaningful opportunity to cross-examine the witness"]; *People v. Blackington* (1985) 167 Cal.App.3d 1216, 1219 [213 Cal.Rptr. 800] [prosecutor's questioning was improper; prosecutor read from witness's statement to police after witness refused to answer questions]; *People v. Harris* (1969) 270 Cal.App.2d 863, 867 [76 Cal.Rptr. 130] [prosecutor asked questions calling "for hearsay answers concerning statements [the witness] had made to various officers about the fight"].)

Relying on *Douglas*, appellant contends the prosecutor's questioning of Wallace "introduced devastating evidence about [his] involvement in the shooting." In *Douglas*, the defendant and another man, Loyd, were charged with assault with intent to murder. (*Douglas, supra*, 380 U.S. at p. 416.) The state tried Loyd first and a jury convicted him. The prosecutor called Loyd as a witness at the defendant's trial, but he asserted the Fifth Amendment and refused to answer questions about the incident. (380 U.S. at p. 416.)

---

him. During closing argument, the prosecutor urged the jury to conclude appellant was referring to Walker during the conversation. At trial, Walker denied having a nickname and none of the testifying witnesses referred to him as "Super Dog."

While questioning Loyd, the prosecutor read a confession Loyd allegedly made to the police wherein he inculpated the defendant. (*Douglas, supra*, 380 U.S. at p. 416.) "Under the guise of cross-examination to refresh Loyd's recollection, the [prosecutor] purported to read from the document, pausing after every few sentences to ask Loyd, in the presence of the jury, 'Did you make that statement?' Each time, Loyd asserted the privilege and refused to answer, but the [prosecutor] continued this form of questioning until the entire document had been read." (*Id.* at pp. 416–417, fn. omitted.) The statements the prosecutor read from the document "recited in considerable detail the circumstances leading to and surrounding the alleged crime; of crucial importance, they named the [defendant] as the person who fired the shotgun blast which wounded the victim." (*Id.* at p. 417, fn. omitted.)

The United States Supreme Court reversed the conviction. It held the defendant's inability to cross-examine Loyd about the alleged confession denied him "the right of cross-examination secured by the Confrontation Clause." (*Douglas, supra*, 380 U.S. at p. 419.) As the high court explained, "Loyd's alleged statement that the [defendant] fired the shotgun constituted the only direct evidence that he had done so; coupled with the description of the circumstances surrounding the shooting, this formed a crucial link in the proof both of [the defendant]'s act and of the requisite intent to murder. Although the [prosecutor's] reading of Loyd's alleged statement, and Loyd's refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that Loyd in fact made the statement; and Loyd's reliance upon the privilege created a situation in which the jury might improperly infer both that the statement had been made and that it was true." (*Ibid.*)

Appellant also relies on *People v. Shipe* (1975) 49 Cal.App.3d 343, 355 [122 Cal.Rptr. 701] (*Shipe*), to support his argument that the prosecutor's questioning violated his right of confrontation. In *Shipe*, the police arrested the defendant and two other men for murdering a drug dealer. (*Id.* at pp. 345–346.) When the police arrested the defendant, he had a knife wound on his hand. (*Id.* at p. 345.) After the two other men pleaded guilty to being accessories after the fact, the prosecutor called them as witnesses at the defendant's trial. Each man answered some preliminary questions but asserted the Fifth Amendment when the prosecutor began asking questions about the incident. (49 Cal.App.3d at p. 346.)

The court determined the witnesses did not have the right to assert the privilege and ordered them to answer. The prosecutor then asked one witness

a series of 17 questions about the incident, including " 'Is it not true that . . . you came back and saw the body of [the victim and] that [the defendant] was on top of him?' " and " 'Is it not true that you saw [the defendant] remove the wallet of [the victim] and take the knife with him?' " (*Shipe, supra,* 49 Cal.App.3d at p. 347.) The prosecutor asked the second witness several questions, including " 'Is it not further true . . . that in your presence [the victim] was stabbed multiple times by your brother, [the defendant]?' " (*Id.* at p. 348.) Through these leading questions, "the prosecutor placed before the jury information which overwhelmingly established [the defendant] as the murderer, provided a narcotics-related motive for the crime, and provided a basis for the inference that two witnesses had revealed this information in their statements to the authorities." (*People v. Burciago* (1978) 81 Cal.App.3d 151, 164 [146 Cal.Rptr. 236].)

The *Shipe* court reversed the conviction and held the prosecutor's questions violated the defendant's right of confrontation. (*Shipe, supra,* 49 Cal.App.3d at pp. 349, 355.) The court characterized the prosecutor's questions as "flagrantly suggestive" and noted a prosecutor may not, "under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony." (*Id.* at pp. 351, 349.) Finally, the court concluded the People could not demonstrate beyond a reasonable doubt that the violation of the defendant's right of confrontation did not contribute to the verdict because the evidence of the defendant's guilt was "entirely circumstantial." (*Id.* at p. 355.)

■ *Douglas* and *Shipe* are distinguishable. In those cases, the defendants did not move to strike either the witnesses' nonresponsive testimony or the prosecutors' leading questions. Here, the court struck Wallace's testimony and instructed the jury not to consider the prosecution's questions as evidence. "The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." (*Tennessee v. Street* (1985) 471 U.S. 409, 415, fn. 6 [85 L.Ed.2d 425, 105 S.Ct. 2078]; see also *People v. Smithey* (1999) 20 Cal.4th 936, 962 [86 Cal.Rptr.2d 243, 978 P.2d 1171] [distinguishing *Douglas* where the jury was instructed to disregard all improper questions and "any answers that may have been given"].)

Finally—in stark contrast to both *Shipe* and *Douglas*—there was independent evidence of appellant's guilt. As noted above, Walker testified he saw appellant point a gun at Tidwell. He also testified he heard gunshots and Tidwell pleading with appellant not to shoot him. During an interview with Detective Day, Eli. said she saw appellant shoot Tidwell. And several

witnesses provided descriptions of the shooter that matched appellant's description. The questions the prosecutor posed, therefore, were not the "only direct evidence" that appellant shot Tidwell. (Cf. *Douglas, supra*, 380 U.S. at p. 419.) Accordingly, neither *Douglas* nor *Shipe* apply here and we conclude appellant was not denied his right of confrontation.

### *Permitting the Prosecutor to Argue a Negative Inference Regarding Wallace's Refusal to Testify Did Not Violate Appellant's Constitutional Rights*

Appellant contends the court violated his due process and confrontation rights by permitting the prosecutor to "argue negative inferences from Wallace's refusal to testify without any evidence that she was trying to protect [him] or that [he] procured her refusal to testify."

■ Compelling a witness to assert a Fifth Amendment privilege before the jury may be reversible error where "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." (*Namet v. United States* (1963) 373 U.S. 179, 187 [10 L.Ed.2d 278, 83 S.Ct. 1151].) As our high court has explained, "[a] person may invoke the constitutional privilege against self-incrimination for a reason other than guilt. The privilege may be asserted, for example, simply to insure that the prosecution against a person charged with a crime is not helped by that person's own statements. Thus, inferring guilt from the mere exercise of the privilege would be improper and is at best based on speculation, not evidence." (*People v. Mincey* (1992) 2 Cal.4th 408, 441 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

■ When a "court determines a witness has a valid Fifth Amendment right not to testify, it is . . . improper to require him [or her] to invoke the privilege in front of a jury; such a procedure encourages inappropriate speculation on the part of jurors about the reasons for the invocation. An adverse inference, damaging to the defense, may be drawn by jurors despite the possibility the assertion of privilege may be based upon reasons unrelated to guilt. These points are well established by existing case law. [Citation.] But where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies. Jurors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony." (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554 [84 Cal.Rptr.2d 655] (*Lopez*).) And where a witness receives immunity, that witness's testimony is compelled and the witness no longer has a privilege against self-incrimination. (*United States v. Washington* (1977) 431 U.S. 181, 187

[52 L.Ed.2d 238, 97 S.Ct. 1814]; *Kastigar v. United States* (1972) 406 U.S. 441, 455–458 [32 L.Ed.2d 212, 92 S.Ct. 1653]; § 1324.)

*Lopez* is instructive. There, the defendant was charged with various felonies, including assault. The information also alleged the defendant committed the assault for the benefit of the Southside criminal street gang. (*Lopez, supra,* 71 Cal.App.4th at p. 1552.) At trial, the prosecutor called a veteran gang member, Juan Miranda, to help establish Southside was involved in a pattern of criminal gang activity. (*Id.* at p. 1553.) The prosecutor intended to have Miranda testify about a gang-related assault he had committed about a month before the incident at issue in *Lopez.* Miranda had already pleaded guilty to the charge and his time to appeal the conviction had expired. (*Ibid.*) Before Miranda took the witness stand, he informed the court he would not testify. The court told Miranda he had no right to withhold testimony and no Fifth Amendment privilege to invoke, but Miranda refused to answer any questions. (71 Cal.App.4th at p. 1553.) The court "ordered Miranda to testify before the jury. Miranda took the stand and refused to answer questions, basing his refusal on a privilege he was not entitled to claim." (*Id.* at p. 1555.)

On appeal, the defendant contended the court erred by "requiring [Miranda] to refuse to testify and finding him in contempt of court in the presence of the jury." (*Lopez, supra,* 71 Cal.App.4th at p. 1552.) The *Lopez* court rejected this claim. It held "the jury was entitled to consider Miranda's improper claim of privilege against him as evidence relevant to demonstrate exactly what the gang expert had opined: that gang members act as a unit to advance the cause of the gang and to protect their members." (*Id.* at pp. 1555–1556.) The court explained that a " 'witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give.' [Citation.] But that is exactly what Miranda tried to do. Given that his decision was fully informed and willful—and in disobedience of a court order—the jury was entitled to consider his defiance against him and, to the extent it validated the gang expert's testimony, against [the defendant]." (*Id.* at p. 1556.)

■ Here, Wallace had no constitutional or statutory right to refuse to testify because the prosecutor granted her immunity. " 'A witness may not employ the privilege to avoid giving testimony that he [or she] simply would prefer not to give.' [Citation.]" (*Lopez, supra,* 71 Cal.App.4th at p. 1556, quoting *Roberts v. United States* (1980) 445 U.S. 552, 560, fn. 7 [63 L.Ed.2d 622, 100 S.Ct. 1358].) As a result, the prosecutor was entitled to urge the jury

to draw an adverse inference about why she refused to testify. (*Lopez, supra,* at p. 1554.) Accordingly, we conclude the court did not violate appellant's confrontation or due process rights when it permitted the prosecutor to argue Wallace refused to testify to protect her boyfriend and the father of her child. (*People v. Sisneros* (2009) 174 Cal.App.4th 142, 151–153 [94 Cal.Rptr.3d 98] [admitting evidence of potential witness's refusal to testify did not violate the defendant's confrontation rights; rejecting the defendant's argument that allowing the jury to draw a negative inference would be improper].)

Appellant contends *Lopez* is distinguishable because the witness's refusal to testify in that case "was relevant to the jury's determination of the validity of the expert's opinion that gang members protect their own" whereas here, there was no evidence he "procured" Wallace's refusal to testify or "had any control" over her actions. Appellant seems to urge us to adopt a rule that would permit a prosecutor to argue a negative inference from a witness's refusal to testify only where the defendant has "procured" that refusal to testify. This argument misses the point. Here, the prosecutor was not urging the jury to infer that appellant tried to suppress Wallace's testimony. Instead, the prosecutor was simply arguing that Wallace had a motive to refuse to testify: to protect her boyfriend and the father of her child by denying the prosecutor her testimony.

Distilled to its essence, appellant's real complaint seems to be that the court erred by allowing the prosecutor to argue an inference from Wallace's refusal to testify because the court had stricken all of her testimony. Put another way, appellant suggests there was no evidentiary basis for a negative inference because the court struck all of Wallace's testimony, including her refusal—without legal justification—to answer the prosecutor's questions. We disagree. To be sure, the court struck Wallace's testimony. But it did not strike the fact that she took the witness stand and refused to testify. The act of her unjustified refusal to answer the prosecutor's questions remained before the jury. Accordingly, the court did not err by allowing the prosecutor to argue a negative inference from Wallace's initial willingness to answer questions and her subsequent and unjustified refusal to answer questions about the incident.

Even if we were to assume the court erred by permitting adverse comment after striking all of Wallace's testimony, we could find the error harmless. (*Chapman v. California* (1967) 386 U.S. 18, 20–21 [17 L.Ed.2d 705, 87 S.Ct. 824].) "[T]he harmless-error inquiry [asks]: Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the

error?" (*Neder v. United States* (1999) 527 U.S. 1, 18 [144 L.Ed.2d 35, 119 S.Ct. 1827], criticized on other grounds in *People v. McCall* (2004) 32 Cal.4th 175, 187, fn. 14 [8 Cal.Rptr.3d 337, 82 P.3d 351].)

At trial, Walker testified he saw appellant point a gun at Tidwell and heard Tidwell yell, "Quit, Boo" and "Don't do it. Don't do it, not me" as shots were fired. Eli. saw a Black man shoot Tidwell and then take money from his wallet. When Detective Day showed Eli. a picture of appellant, Eli. recognized him as the shooter. And although she did not identify appellant at trial and conceded she did not want to testify because she was scared, she stated Walker did not shoot Tidwell.[5] Tozier also testified Walker did not have a gun.

■ Moreover, the court instructed the jury that the attorney's arguments were not evidence and that it could not consider stricken testimony for any purpose. " ' "[It is] the almost invariable assumption of the law that jurors follow their instructions." [Citation.] "[We] presume that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." [Citation.]' " (*People v. Sisneros, supra*, 174 Cal.App.4th at pp. 152–153, citing *United States v. Olano* (1993) 507 U.S. 725, 740 [123 L.Ed.2d 508, 113 S.Ct. 1770].)

In light of this evidence, we conclude the error was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24.)

*Appellant Is Entitled to One Additional Day of Presentence Custody Credit*

■ The parties agree appellant is entitled to an additional day of presentence custody credit. A defendant is entitled to credit for the date of his arrest and the date of sentencing. (*People v. Heard* (1993) 18 Cal.App.4th 1025, 1027 [22 Cal.Rptr.2d 684].) Here, appellant was arrested on August 7, 2007, and sentenced on April 11, 2008. He is therefore entitled to 249 days of custody credit, not 248.

---

[5] Appellant makes much of the fact that certain witnesses stated the shooter did not have dreadlocks or twisties. But these witnesses all conceded they did not get a good look at the shooter's face and were not able to identify the shooter either in a photo lineup or at trial. But Walker and Eli., both of whom saw appellant either pointing a gun at Tidwell or shooting him, testified appellant wore his hair in cornrows or twisties, which matched the description of appellant given by Detective Day. In addition, Chartina, Tozier's daughter, testified that appellant's skin tone, hair, and height looked similar to the shooter's.

## DISPOSITION

The trial court is directed to amend the abstract of judgment and minutes of the sentencing hearing to show an award for presentence custody credits of 249 days and to forward a copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Needham, J., and Bruiniers, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 2, 2009, S176550. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.