Filed 1/22/14  P. v. Addison CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>STEVE ADDISON,<br><br>    Defendant and Appellant. | A135800<br><br>(Contra Costa County<br>Super. Ct. No. 05-111676-3) |

Appellant Steve Addison was convicted after a jury trial of one count of possession of cocaine base (Health & Saf. Code, § 11350) and one count of possession of heroin (*id.*).  On appeal, he contends (1) allowing a prosecution witness to refuse to testify in front of the jury violated his constitutional rights; (2) a jury instruction regarding accomplice testimony was error; (3) the admission of evidence regarding uncharged acts was error; and (4) he is entitled to additional presentence conduct credits.  We affirm.

## BACKGROUND

Along with codefendant Undeener Foots, appellant was charged with possession of cocaine base for sale (Health & Saf. Code, § 11351.5; count one) and possession of heroin for sale (*id.*, § 11351; count two).  In addition, Foots was charged with sale or transportation of cocaine base (Health & Saf. Code, § 11352, subd. (a); count three), and appellant and Foots were each charged separately with possession of ammunition as a

1

felon (Pen. Code, former § 12316, subd. (b)(1); counts four & five, respectively). Foots pled no contest to the charges against her; appellant proceeded to trial.

At appellant's trial, police officers testified to executing a search warrant on March 18, 2011, targeting a specified apartment in Richmond (the apartment), Foots, and appellant. The officers had conducted surveillance on the apartment since February 2011, but had not seen appellant at the apartment during that time. Appellant and Foots had not been seen together during the surveillance. However, both appellant and Foots, separately, had been seen driving a Lexus associated with the apartment.

On March 18, 2011, the officers detained and searched Foots after she left the apartment. She was carrying cocaine base, over $300 in small bills, and two cell phones. The officers then knocked on the apartment door, announcing they were police. There was no response and they entered the door using a key. Appellant was in the kitchen, wearing pants but no shirt. A search of appellant revealed no indications of criminal activity.

The officers searched the apartment, finding cocaine base and heroin hidden in the back of the freezer. A working digital scale with cocaine residue on it and a plastic baggie containing a cutting agent were found on a kitchen cabinet shelf. Razor blades with cocaine residue on them and two cut straws were found in a kitchen drawer. The officers also found in the kitchen plastic baggies, a bag of balloons, and a coffee grinder containing drug residue. In a closet, the officers found a sock containing unexpended ammunition.

The police saw both male and female clothing in a closet. In the living area, a paper grocery bag held several pieces of paperwork for appellant; however, none of these documents were addressed to appellant at the apartment's address. More of appellant's paperwork and almost $300 in cash were found on a wall heater next to the bed. Appellant's California identification card and cell phone lay at the foot of the bed. An officer asked appellant where the Lexus keys were. Appellant replied the keys were hanging in the kitchen. The officer found a set of keys, including a Lexus key and keys to the apartment, hanging on a fire extinguisher mount in the kitchen.

Foots waived her *Miranda* rights[1] and an officer took a written statement from her. This statement was not admitted at trial and the officer did not testify as to its substance, but she did testify as to the topics of her questions to Foots. As discussed in more detail below, Foots was called as a witness at appellant's trial, answered questions about her no contest plea, and otherwise refused to answer the prosecutor's questions.

The prosecution also submitted evidence about a 2002 incident for which appellant pled guilty to the sale of a controlled substance. In the 2002 incident, an undercover officer approached appellant on the street seeking to buy rock cocaine. Appellant obtained the cocaine from another man, who spit it out of his mouth; appellant then sold the cocaine to the undercover officer.

No witnesses testified for the defense. However, the defense presented documentary evidence showing the apartment was rented in Foots's name alone, and appellant's California Department of Motor Vehicle records contained no record of a Lexus or the apartment.

The jury found appellant guilty on counts one and two of the lesser included offenses of possession of cocaine base (Health & Saf. Code, § 11350) and possession of heroin (*id.*), respectively. The jury found appellant not guilty of possession of ammunition as a felon (count four).

DISCUSSION

I. *Foots's Refusal to Testify*

A. *Background*

Prior to appellant's trial, Foots, through her attorney, indicated her intent to invoke her Fifth Amendment right to avoid self-incrimination because she had not yet been sentenced in this case and because she had a pending federal parole violation case involving the same underlying conduct. The prosecutor then sought, and obtained, an immunity order providing, "no statements or testimony, nor information derived from [Foots's] statements or testimony in this case may be used in any criminal prosecution

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

3

against the witness." Foots's attorney argued this immunity was not coextensive with her Fifth Amendment protections; the trial court disagreed.

The prosecution called Foots as a trial witness and she invoked her Fifth Amendment rights. Her attorney sat next to her and stated on the record, "depending on the question, if it possibly would tend to incriminate . . . Foots, I would be advising her to take the Fifth Amendment," as "I don't believe that the protections afforded in the grant of immunity offer her the same protections as the Fifth Amendment." Foots answered questions about her no contest plea but refused to answer any questions about appellant or the March 18, 2011 incident, even though the trial court ordered her to respond. The questions posed by the prosecutor about appellant were: "I wanted to ask you if on March 18th, 2011, you lived with [appellant] at [the apartment]"; "on March 18th, 2011 . . . did [appellant] have access to [the apartment]"; and "in March of [2011], were you involved in a dating relationship with [appellant]?" When Foots confirmed she would refuse to answer any questions about "the events of March 18th, 2011" and "any relationship that occurred between [her] and [appellant]," the prosecutor ended his questioning. The trial court held Foots in contempt of court for her refusal to answer.

Although the trial court instructed the jury it could not consider for any reason the fact that appellant did not testify, it provided no instruction regarding permissible or impermissible inferences from Foots's refusal to testify. The prosecutor's initial closing statement referred to Foots's refusal to testify but did not urge the jury to draw any specific inference from that fact: "You . . . got to see . . . Foots testify here in court. You got to see how she responded to questions, her demeanor, and you also heard that she was held in contempt for her refusal to answer questions. [¶] These are some of the facts you can use to help you to get a sense about what this case[] is about."

In appellant's closing statement, his counsel argued, "Now, the district attorney is trying to imply that she's trying to help him out. That's why she's not testifying. And that implication is serious because it implies if she were to testify, she would testify to things that would be helpful to [the district attorney]. And we don't know that. There are many reasons why someone might not want to participate in court, and all of them are

4

speculation, me, the [district attorney], for any of you, to figure out why she doesn't say anything. [¶] . . . Maybe she has other legal problems we don't know about. Maybe — how about the actual reason that she gave us about why she doesn't want to testify? She hasn't been sentenced yet in this county. She's pending sentencing. She's not been punished yet for her admission."

In rebuttal, the prosecutor responded, "With respect to . . . reasons . . . Foots would not want to testify, remember, she was given immunity. She was not going to be — nothing she says here will be used against her. So regardless of whether or not she has a pending sentencing, she's required by law to answer questions. That's why she was held in contempt of court. It's this partnership that's in place. There's a reason she didn't want to answer any questions."

B. *Right to Due Process and a Fair Trial*

Appellant first argues the trial court erred by allowing the jury to witness and draw a negative inference from Foots's refusal to testify, and such error violated his right to due process and a fair trial. We conclude appellant has not demonstrated such a violation occurred.

Appellant initially argues Foots properly invoked her Fifth Amendment rights despite the grant of immunity. A witness's testimony may be compelled by a grant of "immunity from use of the compelled testimony in subsequent criminal proceedings, as well as immunity from use of evidence derived from the testimony," because such immunity is "coextensive with the [Fifth Amendment] privilege [against compulsory self-incrimination] and suffices to supplant it." (*Kastigar v. United States* (1972) 406 U.S. 441, 442, 462 (*Kastigar*).) A grant of immunity is enforceable in all jurisdictions, state and federal. (*Murphy v. Waterfront Comm'n.* (1964) 378 U.S. 52, 77-78.)

Appellant contends the "precise contours of what constituted the use forbidden under the grant of immunity was less than clear" but does not identify any particular flaw; the grant plainly prohibited the use of "statements or testimony, [or] information derived from [Foots's] statements or testimony in this case . . . in any criminal prosecution against the witness." Appellant also notes the grant of immunity did not

foreclose the possibility of a future federal prosecution based on independently derived evidence. However, the grant of immunity is still coextensive with the Fifth Amendment because "[b]oth the [immunity] and the Fifth Amendment allow the government to prosecute using evidence from legitimate independent sources." (*Kastigar, supra,* 406 U.S. at p. 461.) Accordingly, appellant has not demonstrated error in the trial court's determination that Foots improperly invoked her Fifth Amendment rights.[2]

Appellant next argues the trial court impermissibly allowed the jury to draw a negative inference from Foots's refusal to testify. "When a 'court determines a witness has a valid Fifth Amendment right not to testify, it is . . . improper to require him [or her] to invoke the privilege in front of a jury; such a procedure encourages inappropriate speculation on the part of jurors about the reasons for the invocation. An adverse inference, damaging to the defense, may be drawn by jurors despite the possibility the assertion of privilege may be based upon reasons unrelated to guilt. These points are well established by existing case law. [Citation.] But where a witness has no constitutional or statutory right to refuse to testify, a different analysis applies. Jurors are *entitled* to draw a negative inference when such a witness refuses to provide relevant testimony.' [Citation.]" (*People v. Morgain* (2009) 177 Cal.App.4th 454, 466 (*Morgain*).)

In *Morgain*, the defendant's girlfriend refused to testify at trial, despite a grant of immunity. (*Morgain, supra,* 177 Cal.App.4th at p. 460.) She had previously spoken to the police, and the prosecutor asked her questions about her prior statement to the police and about whether the defendant had confessed committing the crime to her. (*Id.* at pp. 460-462.) The trial court subsequently struck the witness's testimony, but allowed the prosecutor to argue to the jury that she refused to testify because she was protecting the defendant. (*Id.* at p. 462.) The Court of Appeal rejected the defendant's contention

---

[2]   That Foots may have believed she was properly invoking her Fifth Amendment rights, as appellant argues, does not alter our analysis because "[i]t is 'the duty of [the] court' " — not the witness — " 'to determine the legitimacy of a witness'[s] reliance upon the Fifth Amendment. [Citation.]' [Citation.]" (*People v. Lopez* (1999) 71 Cal.App.4th 1550, 1554 (*Lopez*).) Appellant was entitled to argue to the jury, as he did, that this was the reason for her refusal to testify.

that this violated his due process rights: Because the witness had no right to refuse to testify, "the prosecutor was entitled to urge the jury to draw an adverse inference about why she refused to testify. [Citation.] Accordingly, we conclude the court did not violate appellant's confrontation or due process rights when it permitted the prosecutor to argue [the witness] refused to testify to protect her boyfriend and the father of her child. [Citation.]" (*Id.* at pp. 467-468.) *Morgain* relied on *Lopez, supra,* 71 Cal.App.4th 1550, 1555-1556, which held the jury could consider the defendant's fellow gang member's unwarranted refusal to testify "as evidence relevant to demonstrate exactly what the gang expert had opined: that gang members act as a unit to advance the cause of the gang and to protect their members," and *People v. Sisneros* (2009) 174 Cal.App.4th 142, 152, which held the jury could conclude a fellow gang member's unwarranted refusal to testify "was motivated, at least in significant part, by fear of gang retribution."

Appellant argues these cases are distinguishable because the inferences there "did not rest on the refusal to testify alone," but rather were supported by "other competent evidence" making the inferences reasonable ones. We cannot conclude the inference sought here — that Foots refused to testify because she and appellant were in a "partnership" — was unreasonable. It was supported by other, albeit circumstantial, evidence. The presence in the apartment of appellant, his belongings, and men's clothing, as well as evidence that appellant had driven a car associated with the apartment, are evidence from which a reasonable trier of fact could infer appellant lived in the apartment with Foots.

C. *Right to Confront Witnesses*

Appellant next contends the prosecutor's questioning of Foots violated his right to confront witnesses under the Sixth Amendment to the United States Constitution. We disagree.[3]

"Under the confrontation clause of the Sixth Amendment, a defendant has the right to confront and cross-examine witnesses presented against him. [Citation.] A

---

[3] It is not clear whether this objection was properly raised below. Because we conclude it is without merit, we assume without deciding it was so raised.

7

defendant's confrontation rights may be violated where a prosecutor examines a recalcitrant witness and poses questions that relate to prior statements made by that witness, in circumstances where the witness's recalcitrance effectively prevents cross-examination concerning those prior statements. [Citations.]" (*Morgain, supra,* 177 Cal.App.4th at p. 463.)

Appellant relies on *Douglas v. Alabama* (1965) 380 U.S. 415 (*Douglas*) and *People v. Shipe* (1975) 49 Cal.App.3d 343 (*Shipe*). In both cases, a witness made a statement to law enforcement regarding the defendant's involvement in the crime, and then refused to testify at trial. (*Douglas*, at pp. 416-417; *Shipe*, at pp. 345-346.) The prosecutors nonetheless questioned the witnesses with leading questions implicating the defendants. In *Douglas*, the prosecutor read a series of sentences purportedly from the witness's prior statement, followed by the question, "Did you make that statement?" (*Douglas, supra,* at pp. 416-417.) In *Shipe*, the prosecutor asked specific questions detailing facts about the alleged crime, prefaced by, "Is it not true that . . . ." (*Shipe, supra,* at pp. 346-349). The questioning in these cases was held to violate the defendants' Sixth Amendment rights because a prosecutor "may not, under the guise of cross-examination, get before the jury what is tantamount to devastating direct testimony" that is not subject to cross-examination. (*Shipe*, at p. 349; see also *Douglas*, at pp. 419-420.)

*Douglas* and *Shipe* are distinguishable. In *Douglas*, "[a]lthough the [prosecutor's] reading of [the witness's] alleged statement, and [the witness's] refusals to answer, were not technically testimony, the [prosecutor's] reading may well have been the equivalent in the jury's mind of testimony that [the witness] in fact made the statement." (*Douglas, supra,* at p. 419.) In *Shipe*, the prosecutors asked "blatantly leading questions, . . . creating the almost irrefutable inference" that the defendant was guilty. (*Shipe, supra,* at p. 349; see also *id.* at p. 351 [prosecutor's questions were "flagrantly suggestive"].) In contrast, the prosecutor asked Foots only nonleading questions, without reference to the statement she made to the police: "I wanted to ask you if on March 18th, 2011, you lived with [appellant] at [the apartment]"; "on March 18th, 2011, . . . did [appellant] have

8

access to [the apartment]"; and "in March of [2011], were you involved in a dating relationship with [appellant]?" We cannot conclude such questions were the equivalent of direct testimony from the witness.

Moreover, the jurors were properly instructed that the attorney's questions were not evidence and that they should "not assume that something is true just because one of the attorneys asked a question that suggested it was true." " 'The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the [c]onfrontation [c]lause are at issue.' [Citation.]" (*Morgain, supra,* 177 Cal.App.4th at p. 465 [rejecting challenge based on *Douglas* and *Shipe*].)[4]

II. *Jury Instruction Regarding Accomplice Testimony*

Over appellant's objection, the trial court instructed the jury with CALCRIM No. 335, as follows: "If the crimes of Possession of Cocaine Base for Sale, Possession of Heroin for Sale and Felon Possessing Ammunition were committed, then Undeener Foots was an accomplice to those crimes." The remainder of the instruction directed the jury it could not convict based on uncorroborated accomplice testimony and it should view accomplice testimony tending to incriminate appellant with caution.

Appellant contends this instruction was reversible error because "[i]nforming the jury that Foots was an 'accomplice' effectively told the jury that there was at least one other person who was guilty of the charged crime," and thus "amounted to a directed verdict against appellant."[5] We need not decide whether the provision of the instruction was error, because any error did not prejudice appellant.

---

[4]   Appellant points to testimony by the police officer who took the statement from Foots that the officer "obtained a summary of the events, the particular nature of the relationship between . . . Foots and [appellant]. [The officer] read that summary or . . . stated the summary back to . . . Foots. [Foots] agreed that statement or the summary was correct." This testimony was immediately struck by the trial court after appellant's objection; we again assume the jury followed the court's instruction to disregard this testimony. (*Morgain, supra,* 177 Cal.App.4th at p. 465.)

[5]   Appellant also contends the instruction directed the jury to construe Foots's silence with caution and thus "encouraged them to speculate that her true motive for not

9

First, the jury found appellant not guilty of the specific crimes identified in the instruction, and thus did not conclude the challenged instruction compelled it to find appellant guilty of those charges.

Moreover, the jury was properly instructed on reasonable doubt and the presumption of innocence. " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.]" (*People v. Harrison* (2005) 35 Cal.4th 208, 252.) Viewed as a whole, the instructions cannot reasonably be understood to direct the jury that appellant committed the charged crimes with Foots. (*People v. Heishman* (1988) 45 Cal.3d 147, 162-163 (rejecting challenge that accomplice as a matter of law instruction directed jury to find the defendant acted with witness); accord, *People v. Morris* (1991) 53 Cal.3d 152, 210-211, disapproved of on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1.)

*People v. Hill* (1967) 66 Cal.2d 536 (*Hill*), cited by appellant, does not alter our analysis. In *Hill*, three codefendants were tried together for murder. (*Id.* at pp. 542-543.) Only one of the defendants testified at trial; his testimony implicated himself and the other defendants. (*Id.* at pp. 543, 554-555.) The jury was instructed "if it found the crimes charged to have been committed, 'and if you further find that [the testifying defendant] was an accomplice . . . , then as against [the nontestifying defendants], his testimony must be corroborated.' " (*Id.* at p. 555.) The nontestifying defendants appealed, claiming it was error not to instruct the jury that the testifying defendant was an accomplice as a matter of law. (*Id.* at p. 554.) The court rejected this claim: "where a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants. [Citation.] It is not error even to forego the giving of accomplice instructions where the giving of them would unfairly prejudice a codefendant in the eyes

testifying had to do with appellant's guilt." The jury was only instructed to view any incriminating "testimony" with caution; Foots's silence was not testimony.

10

of the jury.  [Citation.]  In the [*Hill*] case it was not error to leave to the jury the determination of [the testifying defendant's] role as an accomplice and thus avoid imputations of the guilt of [the nontestifying defendants] which might have flowed from the court's direction that the confessing [defendant] was their accomplice as a matter of law."  (*Id.* at pp. 555-556.)

*Hill* is distinguishable because in that case, the accomplice was a codefendant being tried at the same time as the other two defendants.  In contrast, Foots had already pled guilty at the time of appellant's trial.  Moreover, even *Hill* did not hold instructing the jury a codefendant was an accomplice as a matter of law was always prejudicial, but rather that it could be under some circumstances.  We do not find such circumstances present here.

III.  *Admission of Prior Acts Evidence*

Appellant argues the admission of evidence regarding the 2002 incident was reversible error.  We need not decide if the admission was error because any error did not prejudice appellant.  (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Malone* (1988) 47 Cal.3d 1, 22 [*Watson* harmless error standard applies to evidence admitted pursuant to Evid. Code, § 1101, subd. (b)].)

The jury was instructed it could only consider the 2002 incident for two purposes: whether appellant "acted with the intent to possess the controlled substances for sale in this case," and whether he "knew of the substance's nature or character as a controlled substance when he allegedly acted in this case."  The prosecutor's closing statement also identified only these two purposes.

With respect to the first purpose, the jury acquitted appellant of both counts involving sale of controlled substances.  As appellant acknowledges, "the jury did not find evidence of appellant's prior conviction compelling on the issue of intent to sell." As for appellant's knowledge of the controlled nature of the substances, appellant concedes he did not dispute this element: "The defense theory was that it was Foots alone who was selling drugs out of her apartment. . . .  Appellant never claimed that he did not

11

know what the drugs were" and "did not dispute that he knew the nature of the drugs found in the freezer."

Appellant argues the admission was nonetheless prejudicial because the jury must have used the evidence as propensity evidence. The jury was instructed not to consider the evidence for any purpose other than the two purposes listed above, and was further instructed: "Do not conclude from this evidence that [appellant] has a bad character or is disposed to commit crime." We must presume the jury followed the instructions given them. (*People v. Tully* (2012) 54 Cal.4th 952, 1056.)

IV. *Custody Credits*

Appellant's crime took place on March 18, 2011. He was sentenced on May 14, 2012. As of October 1, 2011, the Legislature changed the formula for calculating presentence custody conduct credits contained in Penal Code section 4019. (Stats. 2011, ch. 39, § 53, eff. June 30, 2011, operative Oct. 1, 2011; amended section 4019.) The formula as amended applied only to persons confined "for a crime committed on or after October 1, 2011." (§ 4019, subd. (h).) At sentencing, the trial court awarded appellant conduct credits pursuant to the version of section 4019 in effect on March 18. (Stats. 2010, ch. 426, § 2, eff. Sept. 28, 2010.) Appellant argues all or some of his conduct credits should have been calculated pursuant to amended section 4019.

Appellant first argues equal protection requires amended section 4019 apply retroactively to his presentence custody, a challenge he concedes has been rejected by the California Supreme Court. (*People v. Lara* (2012) 54 Cal.4th 896, 906, fn. 9; *People v. Brown* (2012) 54 Cal.4th 314, 328-330.) We are bound by those decisions. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Appellant next argues, again on equal protection grounds, that amended section 4019 applies to days he spent in presentence custody after September 30, 2011. This argument was rejected in *People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 53-56 (*Rajanayagam*). *Rajanayagam* held a rational relationship existed between the challenged classification and the legislative purpose of balancing cost savings with public safety: "Under the very deferential rational relationship test, we will not second-guess the

12

Legislature and conclude its stated purpose is better served by increasing the group of defendants who are entitled to enhanced conduct credits when the Legislature has determined the fiscal crisis is best ameliorated by awarding enhanced conduct credit to only those defendants who committed their offenses on or after October 1, 2011." (*Id.* at p. 56.) We agree with the reasoning of that case.

Appellant finally contends, this time on statutory construction grounds, that amended section 4019 applies to days spent in presentence custody after September 30, 2011. He relies on the following statutory language, which he contends is ambiguous and should be construed in his favor under the rule of lenity: "The changes to this section . . . shall apply prospectively and shall apply to prisoners who are confined . . . for a crime committed on or after October 1, 2011. Any days earned by a prisoner prior to October 1, 2011, shall be calculated at the rate required by the prior law." (§ 4019, subd. (h).)

We disagree. Amended section 4019, "subdivision (h)'s first sentence reflects the Legislature intended the enhanced conduct credit provision to apply only to those defendants who committed their crimes on or after October 1, 2011. Subdivision (h)'s second sentence does not extend the enhanced conduct credit provision to any other group, namely those defendants who committed offenses before October 1, 2011, but are in local custody on or after October 1, 2011. Instead, subdivision (h)'s second sentence attempts to clarify that those defendants who committed an offense before October 1, 2011, are to earn credit under the prior law. However inartful the language of subdivision (h), we read the second sentence as reaffirming that defendants who committed their crimes before October 1, 2011, still have the opportunity to earn conduct credits, just under prior law. [Citation.] To imply the enhanced conduct credit provision applies to defendants who committed their crimes before the effective date but served time in local custody after the effective date reads too much into the statute and ignores the Legislature's clear intent in subdivision (h)'s first sentence." (*Rajanayagam, supra,* 211 Cal.App.4th at p. 52, fn. omitted; accord, *People v. Miles* (2013) 220 Cal.App.4th 432, 435-436; *People v. Ellis* (2012) 207 Cal.App.4th 1546, 1552-1553.)

The trial court did not err in calculating presentence credits.

13

DISPOSITION

The judgment is affirmed.

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
BRUINIERS, J.