Filed 1/29/15  P. v. Hinton CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>RICHARD LAMONT HINTON,<br><br>　　Defendant and Appellant. | B251315<br><br>(Los Angeles County<br>Super. Ct. No. BA391305) |

APPEAL from a judgment of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed as modified.

Marilyn G. Burkhardt, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

# I. INTRODUCTION

A jury convicted defendant, Richard Lamont Hinton, of the second degree murder of Joseph Gilbert. (Pen. Code, § 187, subd. (a).) Mr. Gilbert died of multiple stab wounds. Defendant claimed self-defense, heat of passion or imperfect self-defense. The defense was premised on defendant's alleged actual and reasonable belief Mr. Gilbert had a gun. Defendant was sentenced to 16 years to life in state prison. We modify defendant's presentence custody credit. We affirm the judgment in all other respects.

# II. THE EVIDENCE

Derrick Townsend and his girlfriend, Lavenia Wilson, invited several people over to their apartment in the late evening of Thanksgiving 2011. The guests included a friend, Ashley Scott, and her boyfriend, Mr. Gilbert. Mr. Townsend's friend, Jabari Tate, arrived accompanied by defendant. Mr. Tate had known defendant for more than 10 years. They were close friends and fellow gang members. Neither Mr. Townsend nor Ms. Wilson knew defendant. Defendant's gang and Mr. Gilbert's gang were rivals. The group shared alcohol, marijuana and cocaine.

Mr. Gilbert was "hyperactive" and made offensive comments, including words disrespectful of defendant's gang. Sometime later, defendant suddenly assaulted Mr. Gilbert. Mr. Townsend, Ms. Wilson and Ms. Scott testified they saw defendant grab Mr. Gilbert by the shirt. They saw defendant pull out a folding knife. Defendant then begin stabbing Mr. Gilbert in the upper torso. The knife had a four or five-inch blade. Mr. Gilbert screamed out that he was being stabbed. All four witnesses—Mr. Townsend, Ms. Wilson, Ms. Scott and Mr. Tate—saw Mr. Gilbert reach out with both hands in reaction to the attack. Mr. Gilbert did not have anything in his hands. He did not have a gun in his hands.

Ms. Scott tried to stop the attack. She got between defendant and Mr. Gilbert. When that happened, defendant reached over her and continued to stab Mr. Gilbert. Ms.

2

Scott suffered a stab wound to the forearm. Mr. Townsend intervened and pulled the two men apart. Mr. Tate took the knife from defendant's hand.

According to three of the four eyewitnesses, defendant urged Mr. Tate to continue the attack. Mr. Townsend heard defendant say: "Just finish him."; "Finish him off. Finish him off."; "Finish him, blood. Get this crab ass nigger." Ms. Scott recalled defendant saying: "Finish that nigger. Finish that nigger." Ms. Wilson heard defendant say, "Finish him off, Blood." Mr. Tate, who testified for the defense, heard defendant say, "[G]et him off me." Mr. Townsend and Ms. Scott both estimated defendant stabbed Mr. Gilbert 10 to 12 times. Ms. Wilson's estimate was, "Maybe about 15 times . . . ." In fact, defendant stabbed Mr. Gilbert 11 times.

Mr. Gilbert started to leave the apartment. Defendant attempted to pull Mr. Gilbert back in. Mr. Tate intervened again and Mr. Gilbert escaped. Ms. Wilson never heard anyone say anything about a gun. She did not see anyone with a gun. Mr. Gilbert's girlfriend, Ms. Scott, testified that during the entire day she had not seen Mr. Gilbert with a gun. She had not seen him with any type of weapon at all. Mr. Tate, defendant's friend, also never saw a gun. Mr. Tate described the conversation with defendant as they fled the scene. Defendant told Mr. Tate that Mr. Gilbert had a gun. According to defendant, Mr. Gilbert was going to use the gun to kill them.

Defendant testified in his own defense. Defendant was not arrested until several months after the murder. He knew the police were looking for him, but he did not turn himself in because he was afraid he would lose his freedom. On the evening of the stabbing, defendant had been in Mr. Townsend's apartment for about 45 minutes after Mr. Gilbert arrived. Defendant had been introduced to Mr. Gilbert. Mr. Gilbert had been "animated" but there had not been any problem between them. Mr. Gilbert did not say anything that made defendant angry. Defendant did overhear Mr. Gilbert on a cellular telephone call saying, "[M]an, I'm over here in the jungles and I'm out of bounds, but I'm all right." Defendant characterized Mr. Gilbert's statement thusly: "[I]n my prior experience, when I was in the streets, hanging out, when you're out of bounds, you're in

3

the neighborhood where you don't belong. Now, you say you're all right. That means you feel safe. . . . I don't know why he felt safe, but he felt safe. . . ."

Later, defendant prepared to exit the apartment. Mr. Gilbert came up behind defendant and nudged defendant in the back with a gun. At the same time, with the other hand, Mr. Gilbert reached into defendant's left jacket pocket. Defendant had his cellular telephone, his wallet and cash in that pocket. Defendant turned around and saw a gun in Mr. Gilbert's right hand. It was a small, black, semi-automatic handgun, .32 to .380 caliber. Mr. Gilbert was pointing the gun at defendant's mid-chest area. Defendant immediately pulled a switchblade knife out of his jacket pocket and engaged the blade. Defendant then grabbed Mr. Gilbert. Defendant then stabbed Mr. Gilbert. Defendant was yelling to everyone in the room, "[H]e's got a gun." Defendant was frightened and angry and it happened fast. Defendant testified, "I was in fear of my life." On cross-examination, defendant repeated: "I feared for my life. I thought he was going to kill me." Defendant had no idea how many times he stabbed Mr. Gilbert. Defendant did not know what happened to the gun. Defendant denied saying, "Finish him." Defendant testified: "I said get him away from me. He has a gun. I said don't let him get me." Defendant then left with Mr. Tate. Defendant searched his pockets as he walked to get into a car. Defendant did not know whether Mr. Gilbert took anything. But defendant testified his cellular telephone and some money were missing.

In rebuttal, Detective Paul Funicello testified concerning an interview with Mr. Tate two or three weeks after the stabbing. Detective Funicello described Mr. Tate's statement, "Mr. Tate at no time claimed he saw a gun." Mr. Tate described what he heard during the stabbing: "He said, when he heard the fight, . . . he heard no arguments, no yelling, screaming, nothing of that nature. [¶] . . . It was just the sheer motion of the sounds of the fight, but no verbal, yelling, screaming, fighting, arguing anything like that. [¶] . . . The only thing he told me that he recalled hearing was, once he removed the knife from the defendant, the defendant yelled at Tate to get him." Further, according to Mr. Tate, defendant never stated anything about "actually" seeing a gun. Rather, defendant said he just "thought" he saw a gun.

4

## III.  DISCUSSION

### A.  Effective Assistance Of Counsel

Defendant was represented by Frank Duncan.  During direct examination, Mr. Duncan, asked defendant about a prior conviction:  "Now, Mr. Hinton, you have a previous conviction for 417 of the Penal Code, brandishing a firearm?"  Defendant responded, "Yes."  Defendant contends he was denied effective assistance of counsel.  Defendant bases this contention on the following:  the prior brandishing a firearm conviction did not involve moral turpitude and was thus inadmissible for impeachment purposes; the evidence was inadmissible under Evidence Code section 352; Mr. Duncan could not have had a tactical reason for introducing the prior brandishing a firearm conviction; and prejudice resulted.  Defendant reasons he was prejudiced because the challenged evidence indicated he was a violent person.  To prevail on an ineffective assistance of counsel claim, defendant must show first, deficient performance, and second, prejudice.  Prejudice occurs when there is a reasonable probability that, but for counsel's deficient performance, the result would have been different, i.e., more favorable to defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 693-694; *People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1009; *People v. Williams* (2013) 56 Cal.4th 630, 690.)  However, we need not consider whether Mr. Duncan's performance was deficient.  This is because defendant has failed to establish, as a demonstrable reality, that he suffered prejudice.  (*Strickland v. Washington, supra,* 466 U.S. at p. 697; *People v. Carrasco* (2014) 59 Cal.4th 924, 982; *People v. Lawley* (2002) 27 Cal.4th 102, 136.)

The evidence of defendant's guilt was overwhelming.  The eyewitnesses' accounts of the incident were very consistent.  None of the eyewitnesses to the stabbing saw a gun in Mr. Gilbert's hand.  None of the eyewitnesses heard defendant say anything about a gun.  All of the eyewitnesses saw Mr. Gilbert's empty hands reaching out in an attempt to disengage from the attack.  No gun was ever recovered.  Defendant continued to stab the

5

Mr. Gilbert even after Ms. Scott stepped between the two men.  Eventually, Mr. Tate took the knife from defendant.  The witnesses heard defendant urge Mr. Tate to "finish . . . off" Mr. Gilbert.  Defendant fled the scene.  He failed to turn himself in even when he knew the police were looking for him.  Defendant spoke to Mr. Tate immediately after the stabbing. Defendant said he only *thought* he saw a gun.  Defendant never said he actually saw a gun.  Mr. Duncan asked only one isolated question concerning defendant's prior conviction.  No further mention was made of defendant's brandishing a firearm conviction.  That defendant had been convicted of brandishing a firearm, without more, was not particularly inflammatory.  And both Mr. Tate and Ms. Scott had prior felony convictions.  Further, the jury was instructed to consider defendant's prior conviction only for purposes of assessing his credibility.  We presume the jury followed that instruction.  (*People v. Homick* (2012) 55 Cal.4th 816, 879; *People v. Coffman* (2004) 34 Cal.4th 1, 73.)  Moreover, the jury rejected manslaughter as a lesser included offense on a heat of passion or imperfect self-defense theory.  There is no reasonable probability the result would have been more favorable to defendant had Mr. Duncan not elicited the isolated admission concerning the prior brandishing a firearm conviction.

## 2.  Presentence Custody Credit

The trial court gave defendant credit for 580 days in presentence custody.  We asked the parties to brief the question whether defendant was entitled to additional credit.  Defendant was arrested on January 19, 2012, and sentenced on August 29, 2013.  He is therefore entitled to 589 days of credit, not 580.  (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; *People v. Morgain* (2009) 177 Cal.App.4th 454, 469.)  The judgment must be modified and the abstract of judgment amended to so provide.  (*People v. Ramirez* (2014) 224 Cal.App.4th 1078, 1086-1087; *People v. Blunt* (1986) 186 Cal.App.3d 1594, 1602.)

## IV. DISPOSITION

The judgment is modified to reflect 589 days of presentence custody credit.  In all other respects, the judgment is affirmed.  Upon remittitur issuance, the clerk of the superior court is to prepare an amended abstract of judgment and deliver a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


TURNER, P.J.

We concur:


MOSK, J.


GOODMAN, J.*

---

*    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.