Filed 12/29/23  P. v. Downs CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. LADARIOUS DOWNS, Defendant and Appellant. | B321112 (Los Angeles County Super. Ct. No. NA103796) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura L. Laesecke, Judge.  Affirmed as modified.

Richard D. Miggins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Scott A. Taryle and Rene Judkiewicz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an amended information filed by the Los Angeles County District Attorney's Office, defendant and appellant Ladarious Downs was charged with murder (Pen. Code, § 187, subd. (a); count 1)[1] and attempted murder (§§ 664, 187, subd. (a); count 2). Firearm and gang enhancements were also alleged.

As to count 1, a jury found defendant guilty of second degree murder and found true the allegation that he personally and intentionally discharged a firearm, causing great bodily injury or death, within the meaning of section 12022.53, subdivision (d). The jury found the gang allegation under section 186.22, subdivision (b)(1)(c), to be not true. The jury found defendant not guilty of attempted murder as alleged in count 2.

The trial court sentenced defendant to a total term of 40 years to life in state prison, consisting of 15 years to life for the murder plus 25 years to life for the firearm enhancement.

This appeal followed. Subsequently, defendant filed a petition for writ of habeas corpus in case No. B330535.[2]

_____

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] In accordance with our August 11, 2023, order, we have concurrently considered defendant's petition for writ of habeas corpus with this appeal. We find no merit in defendant's contention that the trial court "abused discretion, expressed bias, commit[t]ed misconduct and otherwise erred in rulings that in

2

# BACKGROUND

I. *The People's Evidence*

A. <u>The March 2, 2016, fight</u>

On March 2, 2016, defendant or his cousin was punched in the chest during a fight with a group of people that included Kevin Reed (Reed).

B. <u>The March 3, 2016, shooting</u>

The next day, defendant told Larry Williams (Williams) that "he wanted to have another fight, because he felt like he lost and he wanted to redeem himself[.]" Defendant said, "'I'm not gonna let this go, I'm gonna fight and redeem myself,'" and "'I ain't no punk[.]'" Williams and defendant were both members of the Insane Crip gang.

Later that day, defendant, Donald Lee (Donald), and Donald's brother[3] walked to a corner liquor store and encountered a group of men. The group of men asked defendant and the Lees, "'Oh, where are you guys from?'" Defendant and the Lees responded, "'We don't bang, nothing like that[,]'" and walked away. At the next corner, men yelled and pointed at the Lees and defendant. Gunshots were heard, and the Lees and defendant started running.

When later interviewed by the police, Donald reported that he had seen defendant pull out a gun and shoot three times. Because he heard different gunshots, Donald thought that another man in the group had also fired a shot.

---

[accumulation] and individually denied [him] a fair trial in front of an impartial judge." A separate order will be filed in that matter.

[3]     We refer Donald and his brother, collectively, as "the Lees."

Just before the shooting, Reed ran into a few men, including Tyrone Douglas[4] (Douglas) at a fast food restaurant. Thereafter, Reed went to the liquor store with a few of the men. Reed and his companions were later waiting for Uber rides when defendant, who Reed identified in court as the shooter, fired a gun at the group multiple times. Douglas was shot in the back and died as a result of his injuries.

C. *Perkins*[5] operation

Defendant was the subject of a *Perkins* operation, which entails placing a target of an investigation into a cell with individuals posing as inmates but who are working undercover for law enforcement. Defendant told the *Perkins* agents, "I ain't worried about this weird-ass n**** walking up. . . . And sh** just got ugly . . . ."

II. *Defendant's Evidence*

Defendant represented himself at trial and testified on his own behalf.[6]

Defendant admitted to associating with the Insane Crip gang. He was part of the "Long Beach Movement," which set aside gang rivalries "for the purpose of uplifting Long Beach as a community . . . ." Defendant had known Douglas since 2010, but they had not been close friends for a long time because Douglas was "kind of upset" with defendant's association with the Insane Crip gang.

---

[4] Douglas was a member of the Rolling 20s Crip gang. The Insane Crip gang is the main rival of the Rolling 20s Crip gang.

[5] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

[6] We only summarize portions of defendant's testimony relevant to the issues on appeal.

On March 2, 2016, defendant and his younger brother were "jumped" by a group of people.

On March 3, 2016, defendant was at Williams's house, accompanied by the Lees and another friend who associated with the Bricc Boy Crips. On the way to the basketball courts, defendant stopped at a liquor store. When he came out of the store, defendant saw Douglas across the street. Defendant and Donald crossed the street to go to Douglas's group. Defendant recognized two of the men in the group, who approached defendant about the prior day's fight. Defendant left to go to his godmother's home.

Defendant later went over to Donald's home. Donald told defendant that an incident had happened. Donald wanted to go back, and defendant tried to talk him out of it, saying it was not worth pursuing.

But shortly thereafter, Donald and defendant started heading back to the park. While walking toward the park with Donald, defendant saw Douglas's group come out of the alley. Knowing that Donald had a gun, defendant said, "'Look, bro, don't do nothing stupid'" and "'chill out.'" At some point, Donald said he wanted a "fair fade," meaning a fair fight, and that he wanted defendant to hold onto his gun. Donald gave defendant his gun outside "the sight of the guys."

Donald and defendant returned to the corner. The two groups got closer, and defendant saw someone pointing, followed by a "dude" in white pants reaching in his belt. Someone in the other group said "'F Bugs'" as an insult to the Insane Crip gang.

Defendant told his friend, Jay, to get out of the way, and reached for the gun in his basketball shorts. The man in the white pants was trying to get around Jay. Defendant did not

5

"think the dude [was] gonna shoot" but the man was hesitating, so defendant decided to "go ahead." Defendant fired two shots at the man's feet. The man fell and tried to run. The man "ha[dn't] shot a shot-off" and "seemed more scared than anything." Defendant saw the man's gun on the ground. Another man looked like he was reaching for the gun, so defendant fired a gunshot on the ground. Defendant ran back to his house, not knowing if anyone was dead.

Defendant also testified that killing Douglas was an "accident" and that he did not intend to kill anyone. He aimed at the ground and at the group's legs. Defendant thought that if he did not shoot the man in white pants then he would be shot. He stated: "I thought that if I didn't shoot the gun, the dude that had the other gun would shoot me," and "I was hoping it would hit the person that I was shooting at, which was the person who had the gun." He testified that he felt threatened because one of the people in the group had a gun.

Regarding the *Perkins* operation, defendant explained that he used the term "weird-ass n****" to refer to the armed man in the other group.

## DISCUSSION

I. *Refusal to Give Voluntary Manslaughter Instruction*

Defendant argues that the trial court erred in refusing to instruct the jury on the lesser included offense of manslaughter based on imperfect self-defense (also known as unreasonable self-defense)[7] or defense of others.

---

[7] We use the terms "imperfect self-defense" and "unreasonable self-defense" interchangeably.

A. <u>Relevant proceedings</u>

Following the close of evidence, the trial court discussed jury instructions with the prosecutor and defendant. As to count 1, the court raised voluntary manslaughter as a potential lesser included offense of murder. The court explained its "theory of voluntary manslaughter [a]s the honest but unreasonable belief and the need to defend."

The trial court recalled defendant's testimony that he saw a gun but that he shot first, "initiat[ing] the shooting." The court acknowledged the testimony of both defendant and Donald that another man had a gun at the scene of the shooting. The court asked: "It appears to me [that] we have different arguments about who drew first or what happened, but how do I deal with that?"

Defendant argued that the other man "was actually pointing the gun" even though "he may not have fired first[.]" Defendant contended that he testified that he "was in fear for [his] life that the person was trying to shoot [him]." The trial court asked for several readbacks of testimony and heard additional argument from the parties. The prosecutor disagreed with defendant's characterization of the evidence, contending that "at no point" did defendant "say that somebody was pointing a gun at him[.]" The court declined to make a final decision, opting to take additional time to consider the issue.

The next day, relying on *People v. Valenzuela* (2011) 199 Cal.App.4th 1214 (*Valenzuela*), the trial court noted that in the gang context it would be reasonable to assume that another armed person in a gang confrontation would shoot. Thus, the court ruled that it would not instruct on voluntary manslaughter because it did not "find that there is substantial

7

evidence of an honest but unreasonable need to exercise self-defense." The court would, however, instruct on self-defense.

B. Relevant law and standard of review

"Voluntary manslaughter, a lesser included offense of murder, is defined as the unlawful killing of a human being without malice." (*People v. Vargas* (2020) 9 Cal.5th 793, 827 (*Vargas*).)

"Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime. [Citations.] A killing committed when that belief is *unreasonable* is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133–134; see also *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [unreasonable or imperfect self-defense requires that the defendant have an actual, but *unreasonable*, belief that he was in imminent danger to life or great bodily injury].)

A trial court must instruct on lesser included offenses when there is substantial evidence the defendant is guilty only of the lesser offense. (*Vargas, supra*, 9 Cal.5th at p. 827.) "The 'substantial evidence requirement is not satisfied by "'*any* evidence . . . no matter how weak,'" but rather by evidence from which a jury . . . could conclude "that the lesser offense, but not the greater, was committed."' [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 538 (*Nelson*).) "Speculative, minimal, or insubstantial evidence is insufficient to require an instruction on

8

a lesser included offense. [Citations.]" (*People v. Simon* (2016) 1 Cal.5th 98, 132.)

"'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' [Citation.]" (*Nelson*, *supra*, 1 Cal.5th at p. 538.)

C. <u>Analysis</u>

The trial court did not err in refusing to instruct the jury on the lesser included offense of voluntary manslaughter due to imperfect self-defense/defense of others. As the trial court expressly noted, defendant's belief in the need to shoot at the rival gang was reasonable. After all, both defendant and Donald testified that a man in the other group, a rival gang, had a gun. And defendant stated that he believed that if he did not shoot, "the dude that had the other gun would shoot" him. Thus, the trial court properly instructed the jury on self-defense, not manslaughter. (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1082.)

On appeal, defendant seemingly agrees. He argues that we should find substantial evidence that he had an actual belief that he needed to defend himself or defend those with him from imminent great bodily injury or death. But he directs us to no evidence that his need to shoot was unreasonable, which was the only basis for a manslaughter instruction. (*Valenzuela*, *supra*, 199 Cal.App.4th at pp. 1228, 1230.)

In light of our conclusion that the trial court did not err, we need not address whether any alleged instructional error was harmless.

II. *Imposition of Firearm Enhancement*

As set forth above, the trial court sentenced defendant on December 13, 2021, to an aggregate term of 40 years to life. The

sentence consisted of 15 years to life for the murder, plus a consecutive 25 years to life for the section 12022.53, subdivision (d) firearm enhancement.

Defendant challenges the trial court's imposition of the sentencing enhancement. He contends that pursuant to section 1385, subdivision (c),[8] the trial court abused its discretion in refusing to dismiss the enhancement.[9]

The problem with defendant's argument is that section 1385, subdivision (c), as it now reads, does not apply to defendant's sentence. It only applies to criminal sentencing after January 1, 2022. (§ 1385, subd. (c)(7) ["This subdivision shall apply to all sentencings occurring after January 1, 2022"]; *People v. Flowers* (2022) 81 Cal.App.5th 680, 686, review granted Oct. 12, 2022, S276237.) Because defendant was sentenced on December 13, 2021, the statute does not apply.[10]

---

[8] Section 1385, subdivision (c), provides, in relevant part: "In exercising its discretion under this subdivision [to dismiss an enhancement], the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the [nine statutory] mitigating circumstances . . . are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."

[9] We review issues of statutory construction de novo (*John v. Superior Court* (2016) 63 Cal.4th 91, 95) and the trial court's exercise of its discretion under section 1385 for an abuse of that discretion (*People v. Walker* (2022) 86 Cal.App.5th 386, 395, review granted Mar. 22, 2023, S278309).

[10] Defendant offers no argument as to why the current statute should apply retroactively to his sentence. But even if it did,

III. *Custody Credits*

Presentence custody credits include the date of arrest and the date of sentencing. (*People v. Morgain* (2009) 177 Cal.App.4th 454, 469.) "'A sentence that fails to award legally mandated custody credit is unauthorized and may be corrected whenever discovered. [Citation.]' [Citations.]" (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 235.)

Defendant was arrested on March 15, 2016, and sentenced on December 13, 2021. The number of days between that period, including the day of sentencing is 2,100. The abstract of judgment, however, only reflects 2,097 days of actual custody credits. As defendant argues and the People agree, the judgment must be modified to reflect three additional days of custody credit.

---

there still would be no basis to reverse. The trial court implicitly found that "dismissal of the enhancement would endanger public safety." (§ 1385, subd. (c)(2).) It stated on the record: "I realize that I have the discretion not to impose [sentence on the enhancement], but I'm choosing, based on the facts in this case and my review of the evidence, listening to the trial testimony, to [defendant's] testimony, that it is the proper decision to impose the 25 years to life . . . ."

**DISPOSITION**

The judgment is modified to add three days of actual custody credits for a total of 2,100 days of actual credits. The trial court is directed to prepare an amended abstract of judgment reflecting the modification regarding custody credit, and to forward a copy of the amended abstract to the California Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.*
KWAN

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12